# LANE, SECRETARY OF THE INTERIOR, ET AL. *v.* PUEBLO OF SANTA ROSA.

## APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 197.    Argued January 29, 1919.—Decided March 3, 1919.

The Pueblo of Santa Rosa is a legal entity, with capacity to maintain a suit to protect its rights in land claimed by it as a grantee under the laws of Spain and Mexico.  P. 112.  *Cherokee Nation* v. *Georgia,* 5 Pet. 1, distinguished.

This status of the Pueblo, if it did not previously exist, resulted from a law of the Territory of New Mexico, and from acts of Congress extending the laws of that Territory over the region acquired by the Gadsden Treaty, and over the Territory of Arizona, when the latter was organized; and it was not affected by the creation of the State of Arizona.  *Id.*

Assuming that these Indians are wards of the Government, that fact would not affect the capacity of the Pueblo to sue in the District of Columbia, to restrain the Secretary of the Interior and the Commissioner of the General Land Office from offering, listing, etc., under the public land laws, lands in Arizona to which the Pueblo alleges perfect title under the laws of Spain and Mexico.  P. 113.

In such a suit, where the trial court dismissed the bill on defendants' motion, *held,* error for the Court of Appeals, finding the bill made a case for the relief sought, to award a permanent injunction; for defendants were entitled to answer to the merits as if their motion had been overruled originally.  P. 114.

46 App. D. C. 411, reversed.

THE case is stated in the opinion.

*The Solicitor General,* with whom *Mr. Leslie C. Garnett* was on the brief, for appellants.

*Mr. Ralph S. Rounds,* with whom *Mr. Alton M. Cates* and *Mr. Henry P. Blair* were on the brief, for appellee.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This is a suit to enjoin the Secretary of the Interior and the Commissioner of the General Land Office from offering, listing or disposing of certain lands in southern Arizona as public lands of the United States. The lands include the site of the Pueblo of Santa Rosa and the surrounding territory, comprise some 460,000 acres, and are within the region acquired from Mexico under what is known as the Gadsden Treaty, 10 Stat. 1031. The suit is brought by the Pueblo of Santa Rosa and its right to the relief sought is based on two allegations, which are elaborated in the bill: one, that under the laws of Spain and Mexico it had, when that region was acquired by the United States, and under the provisions of the treaty it now has, a complete and perfect title to the lands in question; and the other, that in disregard of its title the defendants are theatening and proceeding to offer, list and dispose of these lands as public lands of the United States. In the court of first instance the bill was challenged by a motion to dismiss in the nature of a demurrer, and the motion was sustained. In the Court of Appeals the case made by the allegations in the bill was held to be one entitling the plaintiff to the relief sought, and the decree of dismissal was reversed with a direction that a permanent injunction be awarded. 46 App. D. C. 411. The latter decision is challenged here on two grounds: one, that the plaintiff is not a legal entity and has no capacity to maintain the suit; and the other, that, in any event, the defendants should not be subjected to a permanent injunction without according them an opportunity to answer the bill.

The plaintiff is an Indian town whose inhabitants are a simple and uninformed people, measurably civilized and industrious, living in substantial houses and engaged in agricultural and pastoral pursuits. Its existence, prac-

tically as it is today, can be traced back through the period of Mexican rule into that of the Spanish Kings. It was known then, as now, as the Pueblo of Santa Rosa, and its inhabitants were known then, as now, as Pueblo Indians. During the Spanish, as also the Mexican, dominion it enjoyed a large measure of local self-government and was recognized as having capacity to acquire and hold lands and other property. With much reason this might be regarded as enabling and entitling it to become a suitor for the purpose of enforcing or defending its property interests. See *School District* v. *Wood*, 13 Massachusetts, 193, 198; Cooley's Const. Lim., 7th ed., p. 276; 1 Dillon Munic. Corp., 5th ed., §§ 50, 64, 65. But our decision need not be put on that ground, for there is another which arises out of our own laws and is in itself sufficient. After the Gadsden Treaty Congress made that region part of the Territory of New Mexico and subjected it to "all the laws" of that Territory. Act August 4, 1854, c. 245, 10 Stat. 575. One of those laws provided that the inhabitants of any Indian pueblo having a grant or concession of lands from Spain or Mexico, such as is here claimed, should be a body corporate and as such capable of suing or defending in respect of such lands. Laws New Mex. 1851-2, pp. 176 and 418. If the plaintiff was not a legal entity and juristic person before, it became such under that law; and it retained that status after Congress included it in the Territory of Arizona, for the act by which this was done extended to that Territory all legislative enactments of the Territory of New Mexico. Act February 24, 1863, c. 56, 12 Stat. 664. The fact that Arizona has since become a State does not affect the plaintiff's corporate status or its power to sue. See *Kansas Pacific R. R. Co.* v. *Atchison, Topeka & Santa Fe R. R. Co.*, 112 U. S. 414.

The case of *Cherokee Nation* v. *Georgia*, 5 Pet. 1, on which the defendants place some reliance, is not in point.

The question there was not whether the Cherokee tribe had the requisite capacity to sue in a court of general jurisdiction, but whether it was a "foreign state" in the sense of the judiciary article of the Constitution and therefore entitled to maintain an original suit in this court against the State of Georgia. The court held that the tribe, although uniformly treated as a distinct political society capable of engaging in treaty stipulations, was not a "foreign state" in the sense intended, and so could not maintain such a suit. This is all that was decided.

The defendants assert with much earnestness that the Indians of this pueblo are wards of the United States— recognized as such by the legislative and executive departments—and that in consequence the disposal of their lands is not within their own control, but subject to such regulations as Congress may prescribe for their benefit and protection. Assuming, without so deciding, that this is all true,[1] we think it has no real bearing on the point we are considering. Certainly it would not justify the defendants in treating the lands of these Indians—to which, according to the bill, they have a complete and perfect title—as public lands of the United States and disposing of the same under the public land laws. That would not be an exercise of guardianship, but an act of confiscation. Besides, the Indians are not here seeking to establish any power or capacity in themselves to dispose of the lands, but only to prevent a threatened disposal by administrative officers in disregard of their full ownership. Of their capacity to maintain such a suit we entertain no doubt. The existing wardship is not an obstacle, as is shown by repeated decisions of this court,

[1] See *Chouteau* v. *Molony*, 16 How. 203, 237; *United States* v. *Ritchie*, 17 How. 525, 540; *United States* v. *Pico*, 5 Wall. 536, 540; *United States* v. *Sandoval*, 231 U. S. 28; *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294, 307; *Lone Wolf* v. *Hitchcock*, 187 U. S. 553, 568; *Tiger* v. *Western Investment Co.*, 221 U. S. 286, 310, *et seq.*

of which *Lone Wolf* v. *Hitchcock*, 187 U. S. 553, is an illustration.

In view of the very broad allegations of the bill, the accuracy of which has not been challenged as yet, we have assumed in what has been said that the plaintiff's claim was valid in its entirety under the Spanish and Mexican laws, and that it encounters no obstacle in the concluding provision of the sixth article of the Gadsden Treaty, but no decision on either point is intended. Both involve questions not covered by the briefs or the discussion at the bar and are left open to investigation and decision in the further progress of the cause.

Of course, the Court of Appeals ought not to have directed the entry of a final decree awarding a permanent injunction against the defendants. They were entitled to an opportunity to answer to the merits, just as if their motion to dismiss had been overruled in the court of first instance. By the direction given they were denied such an opportunity, and this was a plain and prejudicial error.

Our conclusion is that the decrees of both courts below should be reversed and the cause remanded to the court of first instance with directions to overrule the motion to dismiss, to afford the defendants an opportunity to answer the bill, to grant an order restraining them from in any wise offering, listing or disposing of any of the lands in question pending the final decree, and to take such further proceedings as may be appropriate and not inconsistent with this opinion.

*Decree reversed.*