### CHOCTAW AND CHICKASAW NATIONS v. SEITZ et al.

No. 4331.

United States Court of Appeals
Tenth Circuit.

Dec. 18, 1951.

Writ of Certiorari Denied April 7, 1952.

W. F. Semple, Tulsa, Okl. (Lynn Adams, Oklahoma City, Okl., Grady Lewis, Washington, D. C., and H. L. Fitzgerald, Jr., Tulsa, Okl., on the brief), for appellants.

George N. Otey, Ardmore, Okl., and Charles B. Cochran, Oklahoma City, Okl. (Otey, Johnson & Evans, Ardmore, Okl., and Richardson, Shartel & Cochran, Oklahoma City, Okl., on the brief), for appellees N. G. Seitz, B. S. Gladney, and J. W. Gladney.

John C. Harrington, Atty., Dept. of Justice, Washington, D. C. (A. Devitt Vanech, Asst. Atty. Gen., Cleon A. Summers, U. S. Atty., Muskogee, Okl., Roger P. Marquis and Elizabeth Dudley, Attys., Dept. of Justice, Washington, D. C., on the brief), for United States.

Before PHILLIPS, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

PHILLIPS, Chief Judge.

The Choctaw and Chickasaw Nations [1] brought this action against N. G. Seitz, B. S. Gladney, and J. W. Gladney [2] to recover possession of, and establish their title to, certain lands that were adjudged to be a part of Oklahoma in the final decree entered in State of Oklahoma v. State of Texas, 276 U.S. 596, 48 S.Ct. 297, 72 L.Ed. 723, Id., 281 U.S. 109, 694, 50 S.Ct. 247, 74 L.Ed. 731, 1122, settling the boundary line between the states of Oklahoma and Texas.

The complaint alleges that such lands are approximately 700 acres in area, are located in Love County, Oklahoma, and are a part of the unallotted common domain of the Nations; that such lands are wrongfully and unlawfully withheld by the defendants, who asserted some title, the exact nature of which is unknown to the Nations.

The defendants below filed a motion to dismiss the complaint on the ground of the non-joinder of the United States as a party. The Nations then filed a motion to bring in the United States as a third party defendant. The trial court entered an order making the United States a third party de-

---

1. Hereinafter referred to collectively as the Nations.

2. Hereinafter referred to collectively as the defendants.

fendant. The United States moved to dismiss as to it on the ground that it had not consented to be sued in such action. The trial court dismissed the action as to the United States on the ground that it had not consented to be sued and sustained the motion of the defendants to dismiss the action on the ground that the United States was an indispensable party.

■ It is clear that the action does not fall within the purview of § 3 of the Act of April 12, 1926, 44 Stat. 239, 240, which applies only to allotted lands.

■ In Town of Okemah, Okl. v. United States, 10 Cir., 140 F.2d 963, we held that § 3 of the Act of March 3, 1901, 31 Stat. 1058, 1084, 25 U.S.C.A. § 357, by authorizing condemnation of lands allotted in severalty to Indians, conferred, by implication, permission to sue the United States.[3] But, it is likewise clear that the instant action does not fall within the purview of § 3 of the Act of March 3, 1901, supra, which relates solely to actions to acquire title to Indian lands by condemnation.

■ We held in the Town of Okemah case that there is no statutory provision authorizing the United States to be made a party to suits affecting restricted lands of members of the Five Civilized Tribes apart from § 3 of the Act of March 3, 1901, supra, and § 3 of the Act of April 12, 1926, supra. The same may be said, we think, with respect to suits affecting lands of one or more of the Five Civilized Tribes. Accordingly, we conclude that the United States had not consented to be sued in the instant action and that the order dismissing the action as to the United States was correct.

■ From the beginning of our government the Indian nations or tribes have been regarded as dependent, political communities and wards of the United States.[4]

Under § 16 of the Act of April 26, 1906, 34 Stat. 137, 143, the lands involved in this action, if such lands belong to the Nations, are subject to disposition by the Secretary of the Interior under rules and regulations to be prescribed by him and the proceeds of such sales are to be deposited in the United States Treasury to the credit of the Nations.

■ By reason of its guardianship and its governmental interest in such lands, the United States would not be bound by a judgment in this action, unless it became a party thereto.[5]

■ Hence, we reach the question, Is the United States an indispensable party? In Silver King Coalition Mines Co. of Nevada v. Silver King Consolidated Mining Co., 8 Cir., 204 F. 166, 169, the court defined an indispensable party as follows: "An indispensable party is one who has such an interest in the subject-matter of the controversy that a final decree cannot be rendered between the other parties to the suit without radically and injuriously affecting his interest, or without leaving the controversy in such a situation that its final determination may be inconsistent with equity and good conscience."[6]

Since, unless the United States becomes a party to the action it will not be bound by any judgment entered therein, a judgment entered as between the Nations and the defendants below would not radically and injuriously affect the interest of the United States. The question then narrows to whether a judgment could be entered as between the Nations and the defendants below which would be consistent with equity and good conscience.

3. Cf. State of Minnesota v. United States, 305 U.S. 382, 59 S.Ct. 292, 83 L.Ed. 235.

4. Cherokee Nation v. Southern Kansas Railway Co., 135 U.S. 641, 653, 10 S.Ct. 965, 34 L.Ed. 295; Tiger v. Western Investment Co., 221 U.S. 286, 310–312, 31 S.Ct. 578, 55 L.Ed. 738; United States v. Candelaria, 271 U.S. 432, 439, 46 S.Ct. 561, 70 L.Ed. 1023; United States v. Rickert, 188 U.S. 432, 437, 23 S.Ct. 478, 47 L.Ed. 532.

5. Chisholm v. House, 10 Cir., 160 F.2d 632, 644; Privett v. United States, 256 U.S. 201, 204, 41 S.Ct. 455, 65 L.Ed. 889; United States v. Candelaria, 271 U.S. 432, 443, 444, 46 S.Ct. 561, 70 L.Ed. 1023.

6. See, also, Peterson v. Sucro, 4 Cir., 93 F.2d 878, 881, 114 A.L.R. 890; Franz v. Buder, 8 Cir., 11 F.2d 854, 856.

Since Heckman v. United States, 224 U.S. 413, 442, 446, 32 S.Ct. 424, 433, 56 L.Ed. 820, it has been settled that a restricted allottee may bring an action to establish title to his allotted lands. In that case, the court said: "Undoubtedly an allottee can enforce his right to an interest in the tribal or other property (for that right is expressly granted), and equally clear is it that Congress may enforce and protect any condition which it attaches to any of its grants. * * * The allottee may be permitted to bring his own action, or, if so brought, the United States may aid him in its conduct, * * *."

In Lane v. Pueblo of Santa Rosa, 249 U.S. 110, 113, 39 S.Ct. 185, 186, 63 L.Ed. 504, the court held that the pueblo might maintain an action to prevent a threatened disposal of lands by administrative officers in disregard of their ownership. The court said: "Of their capacity to maintain such a suit we entertain no doubt. The existing wardship is not an obstacle, as is shown by repeated decisions of this court, of which Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299, is an illustration."

In Creek Nation v. United States, 318 U.S. 629, 640, 63 S.Ct. 784, 789, 87 L.Ed. 1046, the court said: "The tribes have not yet been dissolved, and they have had, *both as a general legal right* and by virtue of the very section of the 1906 Act under discussion here, the power to bring actions on their own behalf. That the United States also had a right to sue did not necessarily preclude the tribes from bringing their own actions." (Italics ours.)

In United States v. Candelaria, 271 U.S. 432, 443, 444, 46 S.Ct. 561, 563, 70 L.Ed. 1023, the court held that while a pueblo community in New Mexico is a juristic person with capacity to sue and defend with respect to its lands, a judgment against the pueblo in a suit brought by it to quit title to its lands, to which the United States was not a party, was not a bar to the United States afterwards maintaining a suit to quiet the title to the same lands. The court said:

"It was settled in Lane v. Pueblo of Santa Rosa, 249 U.S. 110, 39 S.Ct. 185, 63 L.Ed. 504, that under territorial laws enacted with congressional sanction each pueblo in New Mexico—meaning the Indians comprising the community—became a juristic person and enabled to sue and defend in respect of its lands * * *.

"The Indians of the pueblo are wards of the United States, and hold their lands subject to the restriction that the same cannot be alienated in any wise without its consent. A judgment or decree which operates directly or indirectly to transfer the lands from the Indians, where the United States has not authorized or appeared in the suit, infringes that restriction. The United States has an interest in maintaining and enforcing the restriction which cannot be affected by such a judgment or decree. This court has said in dealing with a like situation:

" 'It necessarily follows that, as a transfer of the allotted lands contrary to the inhibition of Congress would be a violation of the governmental rights of the United States arising from its obligation to a dependent people, no stipulations, contracts, or judgments rendered in suits to which the Government is a stranger, can affect its interest. The authority of the United States to enforce the restraint lawfully created cannot be impaired by any action without its consent.' "

Thus, it will be seen that the decisions in Heckman v. United States, supra, Lane v. Pueblo of Santa Rosa, supra, and United States v. Candelaria, supra, clearly recognized the rights of restricted Indians and Indian tribes or pueblos to maintain actions with respect to their lands, although the United States would not be bound by the judgment in such an action, to which it was not a party, brought by the restricted Indian or an Indian tribe or pueblo.

We find it difficult to believe that the Supreme Court, in recognizing the right of restricted Indians, Indian tribes and pueblos to maintain an action with respect to their lands, was dealing only with the capacity to maintain the action. Clearly, its language had reference to suits to which the United States was not a party. We cannot think the Supreme Court would have dealt so extensively with the mere capacity of the

restricted Indians, the tribes, and pueblos to sue and defend in respect to their lands, if it regarded the United States as an indispensable party to the action. A holding that restricted Indians, tribes, or pueblos have capacity to prosecute or defend an action with respect to their lands would be of no avail to them, if the United States is an indispensable party to such an action, since the joinder of the United States cannot be compelled. We think the inference must be drawn that the Supreme Court recognized the right of the restricted Indian, tribe, and pueblo to maintain such an action without the presence of the United States as a party.

State of Minnesota v. United States, 305 U.S. 382, 59 S.Ct. 292, 83 L.Ed. 235, and Town of Okemah, Okl. v. United States, 10 Cir., 140 F.2d 963, are clearly distinguishable. Those were actions to condemn lands belonging to Indians, the title to which was held in trust by the United States. The effect of a judgment in those actions would have been an alienation of the lands. The effect of a judgment in favor of the Nations in the instant case will establish the title of the Nations to the lands and give them the possession and use thereof.

It is true that § 18 of the Act of April 26, 1906, supra, authorizes the Secretary of the Interior to bring suits in the name of the United States for the use of the Choctaw, Chickasaw, Cherokee, Creek, or Seminole Tribes, respectively, either before or after the dissolution of the tribal governments, for the recovery of any land claimed by any of such tribes. That is merely declaratory of the well-settled right of the United States, as the guardian of the tribes, to prosecute actions with respect to lands claimed by the tribes. Moreover, § 18, supra, immediately following the language authorizing the Secretary of the Interior to maintain such suits, contains the following proviso: "Provided, That proceedings to which any of said tribes is a party pending before any court or tribunal at the date of dissolution of the tribal governments shall not be thereby abated or in anywise affected, but shall proceed to final disposition." This, we think, was a clear recognition of the right of the tribes to maintain actions to recover lands claimed by them.

Furthermore, by the Joint Resolution of Congress, passed March 2, 1906, 34 Stat. 822, the tribal existence and government of the Five Civilized Tribes were "continued in full force and effect *for all purposes under existing laws* until all property of such tribes, or the proceeds thereof, shall be distributed among the individual members of said tribes unless hereafter otherwise provided by law", (Italics ours) and by § 28 of the Act of April 26, 1906, supra, the tribal existence and tribal governments of the Choctaw, Chickasaw, Cherokee, Creek, and Seminole tribes or nations were "continued in full force and effect *for all purposes authorized by law*, until otherwise provided by law." (Italics ours.)

We think the maintenance of a suit for the recovery of land claimed by a tribe was a purpose authorized by law. The Supreme Court in Creek Nation v. United States, supra, said that the tribes as a general legal right have power to bring actions on their own behalf.

The boundary line dispute between Texas and Oklahoma was settled on March 17, 1930. See State of Oklahoma v. State of Texas, 281 U.S. 109, 694, 50 S.Ct. 247, 74 L.Ed. 731, 1122. More than twenty years have elapsed and the United States has failed to bring an action, in behalf of the Nations, to establish the Nations' title to, and recover for them the possession and use of, the lands involved in this action. When the trial court undertook to compel the United States to be joined as a party, it asserted that it could not be sued without its consent, and it failed to come into the action voluntarily as a party plaintiff. If we hold that the United States is an indispensable party, the Nations will be unable to prosecute a suit to establish their title to, and recover the possession and use of, their lands predicated upon an alleged cause of action which arose more than twenty years ago. On the other hand, if they are permitted to prosecute the suit, in the absence of the United States, a judgment in favor of the defendants will not bind the United States. Defendants assert that that will result in a continuing cloud upon their titles. But, that is their present situation.

461

So long as the United States fails to commence and prosecute to final judgment, an action to establish the title of the Nations to such lands and to recover possession thereof for the Nations, the title of the defendants will continue to be clouded by the possibility of the United States thereafter bringing such an action. So it comes down to this: If we hold that the United States is an indispensable party, the Nations will be unable to assert their longstanding claim to the land; and if we hold that the United States is not an indispensable party, the defendants will run the risk of the burden and expense of defending two lawsuits, even though they succeed in obtaining a judgment in their favor in the instant action.

We are of the opinion that the equities presented by the situation and the inconveniences that will result to the Nations, if they are denied the right to prosecute an action, and to the defendant, if the Nations are permitted to prosecute the action without the joinder of the United States, weigh heavily in favor of the Nations.

We conclude that a final decree determining the title and right to possession as between the Nations and the defendants would not leave the controversy in a situation inconsistent with equity and good conscience.

The judgment is reversed and the cause is remanded for further proceedings in accordance with the views herein expressed.