JACKSON et al. v. SIMS.

No. 4510.

United States Court of Appeals
Tenth Circuit.

Jan. 7, 1953.

Vern E. Thompson, Joplin, Mo. (Loyd E. Roberts, Joplin, Mo., was with him on the brief), for appellants.

Frank Nesbitt, Miami, Okl. (Nelle Nesbitt and Robert E. Nesbitt, Miami, Okl., were with him on brief), for appellee.

Before PHILLIPS, Chief Judge, and MURRAH and PICKETT, Circuit Judges.

MURRAH, Circuit Judge.

The appellants Jean Ann Hoffman Jackson, Geneva Hoffman Ramsay, Henry Edward Hoffman, Jr., and Charles Felix Hoffman, are Quapaw Indian owners of a majority interest in a restricted Quapaw Indian allotment in Ottawa County, Oklahoma, and appellant Henry E. Hoffman, a non-Indian, owns an undivided fractional interest in the same allotment. Section 2 of the Act of July 27, 1939, 53 Stat. 1127, authorizes the leasing of restricted Quapaw Indian land for mining or other purposes in accordance with rules and regulations prescribed by the Secretary of the Interior, provided that "no lease, modification, or assignment thereof shall be made over the written protest of adult Indians owning a majority interest therein."

On May 10, 1945, a departmental mining lease was executed in pursuance of the rules and regulations of the Secretary of the Interior on the restricted Indian allotment by all of the then restricted and unrestricted owners of interests therein to the Kansas Exploration Company, a New York corporation, for a period of ten years, and as long thereafter as lead and zinc minerals might be produced in paying quantities, not to extend, however, beyond March 2, 1971. The lease carried a royalty of 12½%. Mining operations were carried on under the terms of the lease until a part of the equipment was destroyed by fire in June 1946. Shortly thereafter, the lessee ceased operations, and in 1949 sold all of its properties, including the equipment on this lease, to George Potter, at the same time executing an assignment of the lease to Potter. When the Indian owners of a majority interest in the leased land protested the assignment, the Secretary of the Interior necessarily refused approval.

A short time later, the lessee executed a "mining sublease" to appellee Dewey S. Sims, who entered into a contract with Potter to rent the equipment thereon for 25% of the net profits from the mining operation. When the sublease was approved by the Secretary of Interior over the protest of the Indian owners, this declaratory action was brought in the District Court for the Northern District of Oklahoma, to construe Section 2 of the Act of July 27, 1939, to prohibit the so-called subleasing of the land, and to enjoin operations under the "mining sublease". The suit is predicated on a twofold contention: that the proviso in Section 2 forbidding "modification, or assignment" of leases over the protest of a majority of the Indian owners includes subleasing; and if not, then the so-called sublease is in fact an assignment within the meaning of the statute.

From the evidence, the trial court found that the sublease executed February 15,

1950 ending April 10, 1955, thirty days prior to the expiration of the primary term of the original lease, and approximately sixteen years prior to the extended term, at a royalty of 12½%, left a reversionary period in the lessee; and that the parties to the sublease did not conspire to transfer all right, title and interest of the lessee in the original lease in order to evade the provisions of the statute prohibiting a modification or assignment of a mining lease over the protest of the adult Indian owners. The court accordingly validated the sublease, dismissed the action, entered judgment for the appellee, and the appellants have appealed.

The argument on appeal is to the effect that when Congress took away the power of the Secretary of the Interior to approve any lease, modification or assignment thereof over the written protest of the Indian owners of a majority interest in restricted Indian land, it intended to give to such Indians the right to accept or reject the party who was to operate the mining lease on their land; that while the statute does not use the word "sublease" it was intended to cover and include any operating contract where the lessee becomes in effect the sole operator under the rules and regulations of the Secretary of the Interior; that this contract, called a sublease, was actually intended to be an assignment for all practical purposes; and that the transaction was nothing more than a subterfuge to avoid the restriction against assignment over the protest of the Indians owning a majority interest. Tracing the history of the legislation, our attention is called to the efforts of the Indian Tribe to extend restrictions on their land, while at the same time giving the Indian owner some voice in the selection of the lessee or operator of the mining leases, culminating in the enactment of Section 2 of the Act of July 27, 1939, and we are urged to construe the prohibitions in the Act liberally to effectuate what is said to be the manifest Congressional intendment.

■ Prior to the 1939 Act, the Secretary of Interior was authorized to lease Quapaw restricted lands for mining purposes for such period of time and under such terms and conditions as he might prescribe, and the Quapaw Indian owners had no voice in the leasing or the assignment of leases on their lands. See Act of March 3, 1921, 41 Stat. 1225–1249. The 1939 Act, extending the restrictions, was intended to accord the Indian owners some control over the leasing of the lands by granting a majority of the Indian owners a veto over the action of the Secretary. And, in recognition of the Congressional intent, the Commissioner of Indian Affairs, in a letter to the Quapaw Indian Agent, expressed the view that the Indians "should have a considerable degree of control in the leasing of the land." Of course we should not give the words of a statute a strained or technical meaning, if to do so would defeat the legislative purpose. 50 Am. Jur. Statutes, Para. 278, p. 265.

Section 16 of the original mining lease to the Kansas Exploration Company, the form of which was prescribed by the regulations of the Department of Interior, provided that "The lessee shall not assign, by operating contract or otherwise, this lease or any interest therein, without the written consent thereto by the Secretary of the Interior * * *." It is suggested that by such language, the Secretary of the Interior intended to include any operating contract within the vernacular of assignment, and that such construction is in consonance with the purposes of the Act. But Section 20 of the applicable regulations (Title 25 C.F.R. 201.20) provides that "Leases granted or approved under the regulations * * * may be assigned and the leased premises may be subleased or sublet, but only with the consent and authority of the Secretary of the Interior * * * ." And, Section 24 of the lease provides that "The lessee may, with the approval of the Secretary of Interior, sublease or contract to sublease to others. * * *" It is thus clear that both the regulations and the lease recognized the legal distinction between assignments and subleases. There is nothing in the regulations or the lease from which it can be

said that the Secretary considered or treated assignments or subleases synonymously.

The law generally recognizes a distinction between an assignment and a sublease. Oklahoma follows the general rule to the effect that a conveyance which does not pass the whole interest of the lessee for the full term, but retains some sort of reversionary interest, is a sublease and not an assignment. Leckie v. Dunbar, 177 Okl. 355, 59 P.2d 275; Caudle v. Brannon, 176 Okl. 394, 56 P.2d 131. See also Gordon Investment Co. v. Jones, Colo., 227 P.2d 336; 51 C.J.S., Landlord and Tenant, § 37, p. 553; 32 Am.Jur. Landlord and Tenant, Sec. 392, p. 331. In a sublease, there is neither privity of contract nor privity of estate between lessor and sublessee. Leckie v. Dunbar, supra. Section 2 of the 1939 Act is barren of any reference to subleases, and we are not at liberty under the guise of construction to import into the legislation words of distinctive meaning which the Congress did not include.

But, the appellants point to the fact that the original lease was embraced within the so-called sublease, the sublessee agreeing to carry out all of its provisions; that the sublessor retained no royalty or any other reversionary interest save the bare thirty days before the expiration of the primary term; that Sims and Potter were mining partners, not only in this venture but in others, and that when the whole transaction is looked at in its context, there can be nothing more than a plain and studied purpose to circumvent Section 2 of the Act.

It is true, as appellant suggests, that Sims and Potter were mining partners in other ventures, and that Potter was to share in the net profits from the mining operations under the so-called sublease. Furthermore, appellee Sims had unsuccessfully sought to lease the lands before entering into the contract with Potter. But Potter was the owner of the equipment located on the lease and there was no legal impediment to the rental of this equipment to anyone authorized to operate the lease. The question is, after all, one of good faith, and having decided that the lessee was empowered to sublease over the protest of the Indian owners, we cannot attribute to the parties, including the Secretary of the Interior, an intent to circumvent the statute. In any event, we are unable to say that the findings of the trial court in that respect are clearly erroneous.

The question of the indispensability of the Secretary of the Interior as a party to the suit was suggested in appellee's brief, but not argued. Of course the United States is an indispensable party to any action wherein the relief sought would impair its governmental function to protect the allotted lands against alienation. Town of Okemah v. United States, 10 Cir., 140 F.2d 963, 964; United States v. Hellard, 322 U.S. 363, 64 S.Ct. 985, 88 L.Ed. 1326. Cf. State of New Mexico v. Backer, 10 Cir., 199 F.2d 426; Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628. In Choctaw and Chickasaw Nations v. Seitz, 10 Cir., 193 F.2d 456, we recognized the distinction between the indispensability of the Secretary of Interior in a suit, the effect of which would alienate Indian land, and the dispensability of the Secretary in a suit, the effect of which would protect Indian land against alienation, particularly where the Secretary refused, refrained or neglected to protect the Indian's interest. Here, the suit is on behalf of the Indians to protect the title to the Indian lands against an attempted alienation with the approval of the Secretary. If Section 2 of the 1939 Act is construed to prohibit the subleasing without the consent of a majority of the Indian owners, approval of the same by the Secretary is beyond his statutory authority and no governmental function would be impaired by granting the relief sought. The denial of relief surely does not impair a governmental function, or leave the controversy in a situation inconsistent with equity and good conscience. While the government may not be bound by the proceedings, it is not an indispensable party as in the Town of Okemah and Hellard cases.

The judgment is affirmed.