**RED LAKE BAND OF CHIPPEWAS, Plaintiff,**

v.

**CITY OF BAUDETTE, MINNESOTA, a municipal corporation; Independent School District No. 386, Successor in Interest to Independent School District No. 111, a municipal corporation; State of Minnesota; Canadian National railroad Company, a corporation, Successor in Interest to the Minnesota and Manitoba Railroad Company, a corporation; Minn–Kota Power Cooperative, Inc., a corporation; First National Bank of Baudette, a corporation; Baudette Oil Co., Inc., a corporation; Larry Larson, dba Rapid River Grain and Seed Company; Howard Mord, dba Howard's Oil Company; and Elwood L. Dahl and Lloydeen E. Dahl, dba Phillips 66, Defendants.**

Civ. No. 4–89–719.

United States District Court, D. Minnesota, Fourth Division.

Feb. 2, 1990.

---

Rodney J. Edwards, Edwards, Edwards & Bodin, Duluth, Minn., Mary V. Barney, Marvin J. Sonosky, Sonosky, Chambers & Sachse, Washington, D.C., for plaintiff.

Adlai W. Brink, Baudette, Minn., for defendant City of Baudette.

John E. Jacobson, Minneapolis, Minn., for defendants City of Baudette and Independent School Dist. No. 386.

Hubert H. Humphrey, III, Minnesota Atty. Gen., and Gail I. Lewellan, Sp. Asst. Atty. Gen., St. Paul, Minn., for defendant State of Minn.

G.W. Harries, Hanft, Fride, O'Brien, Harries, Selbar & Burns, Duluth, Minn., Philip A. Nacke, Hopkins, Sutter, Hamel & Park, of counsel, Washington, D.C., for defendants Canadian Nat. R. Co. and Minnesota & Manitoba Ry. Co.

Daniel C. Adams, Jeffrey R. Ansel, Timothy K. Masterson, Winthrop & Weinstine, St. Paul, Minn., for defendant First Nat. Bank of Baudette.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on the motion of defendants State of Minnesota, Minnesota and Manitoba Railroad Co., First National Bank of Baudette, City of Baudette and Independent School District No. 386 to dismiss for failure to join an indispensable party. The State of Minnesota also moves for dismissal based upon the sovereign immunity. The motions will be denied.

FACTS

This action is brought by the Red Lake Band of Chippewa Indians (the Band) to quiet title in a forty to sixty acre parcel of land and also for the fair market rental value of the property. The subject land is referred to as Government Lots 3 and 4.[1] It is a parcel, roughly the shape of a triangle, located within Baudette, Minnesota, one edge formed by the Rainy River, the other by the Baudette River. Subject matter jurisdiction is alleged to exist by virtue of 28 U.S.C. §§ 1331 and 1362.

The Band is an American Indian tribe with a governing body duly recognized by the Secretary of the Interior. The Minnesota and Manitoba Railroad Co. (the railroad) claims Government Lots 3 and 4 through a grant from the federal government, acting as trustee for the Band. The crux of this action is the Band's claim that the railroad received an easement interest, not a fee interest, from the United States. The other defendants all have claims to the land which derive in some fashion from the railroad. For instance, the State holds an interest in land acquired from the railroad on which State Trunk Highway 72 runs and also on six acres used as a wayside rest area and public park. The United States, which is not a party, leases a customhouse on land now owned by the City of Baudette. The United States also has a flowage easement on Government Lots 3 and 4, acquired in 1936 by condemnation from the railroad in order to fulfill its obligation under a treaty with Canada to assist in regulating the level of Lake of the Woods.

*The Nelson Act*

The Red Lake Reservation, as established by treaty in 1863, contained more than 3.5 million acres. In 1889, pursuant to the Nelson Act of January 14, 1889, ch. 24, 25 Stat. 642, the Band relinquished to the United States approximately 2.9 million acres of land. The relinquished lands were to be surveyed and classified as either "pine lands" or "agricultural lands." The pine lands were to be appraised, with the timber itself being valued at a rate not less than $3.00 per thousand board feet, and then sold for no less than the appraised value. The agricultural lands were to be disposed of under the homestead laws for a price of $1.25 per acre. Ch. 24, §§ 4–6, 25 Stat. at 643–45. Proceeds from the disposal of these lands were to be placed in the United States Treasury in trust for the Band.

The Nelson Act stated that the relinquishment of land "shall operate as a complete extinguishment of the Indian title without any other or further act or ceremony whatsoever." Ch. 24, § 1, 25 Stat. at 642. The Supreme Court has, however, found that the Act did not constitute an outright transfer of title but operated instead as a cession in trust.[2] *United States v. Mille Lac Band,* 229 U.S. 498, 508, 33 S.Ct. 811, 815, 57 L.Ed. 1299 (1913); *Minnesota v. Hitchcock,* 185 U.S. 373, 394–95, 22 S.Ct. 650, 658–59, 46 L.Ed. 954 (1902). *See also* Vol. II, Opinions of the Solicitor, Department of the Interior 1752, 1753–54 (1956). The significance of a cession in trust is that beneficial title re-

1. The legal description of the land in dispute is Government Lots 3 and 4, Section 35, Township No. 161 North of Range No. 31 West of the Fifth Principal Meridian, Lake of the Woods County, Minnesota.

 The size of the lots is unclear as a result of an inconsistency between the original survey, filed in 1898, which states the combined size of the two lots as 59.25 acres and a 1900 survey which found the two lots to constitute only 43.58 acres.

2. The railroad has cited *United States v. Minnesota,* 466 F.Supp. 1382 (D.Minn.1979), *aff'd,* 614 F.2d 1161 (8th Cir.), *cert. denied,* 449 U.S. 905, 101 S.Ct. 279, 66 L.Ed.2d 136 (1980), for the

proposition that the Nelson Act extinguished all of the Band's property rights in the ceded area. The issue in that case was whether the Band retained hunting, fishing, trapping and wild ricing rights in the land of which the Band had been divested. The question of whether the Nelson Act constituted an outright cession or a cession in trust was neither raised or addressed. The opinion states that the Act "resulted in the sale of the Band's land to the government," 466 F.Supp. at 1385–86 n. 1, but that statement cannot be considered authority for the proposition that the Act constituted an outright cession of Chippewa lands.

mained in the Band unless the United States disposed of the land as provided in the Act. *Ash Sheep Co. v. United States*, 252 U.S. 159, 166, 40 S.Ct. 241, 242, 64 L.Ed. 507 (1920); *United States v. Brindle*, 110 U.S. 688, 693, 4 S.Ct. 180, 182, 28 L.Ed. 286 (1884). *See also*, Opinions of the Solicitor, *supra*.

### The Grant of Land to the Railroad

By Act of April 17, 1900, ch. 193, 31 Stat. 134 (hereinafter referred to as the 1900 Act), the United States Congress made three grants to the railroad. First, the railroad was awarded a 100–foot wide right of-way through four townships in the portion of the Red Lake Reservation relinquished in the Nelson Act. Second, the railroad was provided land adjacent to its right-of-way for structures, such as station houses, machine shops and "turn-outs," necessary for the operation of the railroad. Finally, the railroad was allowed to take land at the crossing of the Rainy River "not exceeding forty acres." Ch. 193, § 1, 31 Stat. at 134. The grant was made on the condition that "no part" of the lands granted to the railroad "be used except in such a manner and for such purposes only as are necessary for the construction, maintenance, and convenient operation of said railroad." *Id.*

All of Government Lots 3 and 4 was included in this grant. The right-of-way passed through both lots, a "station grounds" was located there, and the remainder was taken as part of the additional forty acres made available to the railroad. The railroad paid compensation for the land at a rate of $1.25 per acre.

Following this grant, a dispute arose between the railroad and a homesteader, Thomas Cathcart, as to who had the superior right to land within Government Lots 3 and 4. The dispute was litigated in administrative proceedings culminating in a deci-

sion by the Secretary of the Interior that the railroad had been given a conditional fee interest in Government Lots 3 and 4. *Cathcart v. Minnesota and Manitoba Railroad Co.*, 34 Pub.Lands Dec. 619, 623 (May 26, 1906). The railroad was therefore found to hold a superior right to that land. 34 Pub.Lands Dec. at 626.

Cathcart did not give up the fight, however. He successfully petitioned Congress for the land. In section 21 of the Omnibus Indian Act of May 29, 1908, ch. 220, 35 Stat. 465, 470, Congress authorized the railroad "to convey in fee simple to Thomas Cathcart, his heirs and assigns, such part as may not be needed for railway purposes of [Government Lots 3 and 4 and an adjoining 8–acre strip] granted to [the railroad] for railroad purposes." The 1908 Act further provided that:

> the restrictions upon alienation upon said grant are hereby removed, and the United States hereby relinquishes all claim or title and hereby conveys to said railroad company the fee to such part of said land as shall be conveyed to said Thomas Cathcart.

*Id.*

The Band interprets the legislation as terminating those restrictions only as to the land which was conveyed to Cathcart.[3] However, language in the legislative reports supports the argument that the 1908 Act removed all of the restrictions upon alienation found in the 1900 Act and gave the railroad a fee simple absolute interest in the land. *See* S.Rep. No. 346, 60th Cong., 1st Sess. at 1; H.R.Rep. No. 1324, 60th Cong., 1st Sess., *reprinted in* H.R. Rep. No. 1682, 60th Cong., 1st Sess. at 44.

Curiously, it is not clear at least at this stage of the litigation whether any land was transferred to Cathcart.

### The Restoration of Surplus Lands

The United States continued disposing of the land relinquished under the Nelson Act

---

**3.** The Band thus admits that the 1908 Act extinguishes its claims to any land conveyed to Cath- cart. Band's Answer to Minnesota and Manitoba Railroad Company motion to dismiss at 5.

until 1934 when Congress authorized the Secretary of the Interior to restore to tribal ownership "the remaining surplus lands." Act of June 18, 1934, ch. 576, § 3, 48 Stat. 984. More than ten years later, on February 22, 1945, an Order of Restoration regarding the Red Lake Reservation was issued. Railroad's App. F. That order does not specify which lands are restored. It only refers to

> 157,000 acres, more or less, which have been opened to settlement and sale and which now are or hereafter may be classified as undisposed of, for which the Indians have not been paid, and which are of little or no value for the original purpose of settlement but which will prove of value to said Indians of the Red Lake Reservation if restored to tribal ownership. . . .

Railroad's App. F at 1–2.

Government Lots 3 and 4 appear on several subsequently prepared lists of "Vacant and Unreserved" lands which were relinquished under the Nelson Act. The first of these lists was prepared in 1945. The document is titled "Report on the Status of Ceded Indian Lands Within the Ceded Red Lake Indian Reservation, Minnesota." It consists of a twenty-two page long list of "Vacant and Unreserved" land. Government Lots 3 and 4 are on this list at page 21. Band's App. B.

The next list is a memorandum from the state director of the Bureau of Land Management to the Office of Trust and Economic Development for the Bureau of Indian Affairs dated December 13, 1988. The memorandum was an attempt to specify the tracts of land subject to the February 22, 1945 Order of Restoration. It states:

> A thorough examination of the official land records under the jurisdiction of the Eastern States Office of the Bureau of Land Management indicates that the following described lands were subject to the February 22, 1945 order and restored to Red Lake tribal ownership.

> The official records of the United States will be noted as to the restoration of these tracts.

Band's App. E. Government Lots 3 and 4 appear on the fifteenth and eighteenth pages listing legal descriptions.

On February 14, 1989, a second interdepartmental memorandum was sent by the state director of the Bureau of Land Management to the Office of Trust and Economic Development for the Bureau of Indian Affairs. This list appears to be the same list as contained in the previous memo "rechecked and corrected for typographical errors." It also lists Government Lots 3 and 4 on page 15 of the list. Band's App. F.

DISCUSSION

Title in Government Lots 3 and 4, subject to a cession in trust because of the Nelson Act, is contested. The Band acknowledges that if the federal government disposed of the Band's fee interest in the land under the Nelson Act, the Band has no current claim to title. The Band claims that the United States did not dispose of its fee interest in those lots, however. It claims that the grant to the railroad consisted only of an easement and that beneficial title remained in the Band. The railroad contends that either it was granted a fee interest in 1900 or that the 1900 grant was a conditional fee interest with the conditions removed through legislative action in 1908. The interests of all the other defendants derive from that of the railroad.

Defendants now move for dismissal on two grounds. First, defendants argue that the suit must be dismissed for failure to join an indispensable party, the United States. The parties agree that sovereign immunity and the statute of limitations preclude the joinder of the United States. Second, the State of Minnesota argues that it has not waived its sovereign immunity with respect to this claim and, as a result, this claim is barred by the eleventh amendment.

I. *Failure to Join an Indispensable Party*

■ If a person needed for just adjudication as described in Federal Rule of Civil

Procedure 19(a) cannot be made a party, rule 19(b) provides:

> the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable.

The Supreme Court has held that the following four interests should be examined in each case to determine whether an action should proceed without a party whose absence is compelled:

> (1) the plaintiff's interest in having a forum;

> (2) the defendant's interest in avoiding multiple litigation, inconsistent relief, or sole responsibility for a shared liability;

> (3) the interest of the absent party;

> (4) "the interest of the courts and the public in complete, consistent, and efficient settlement of controversies."

See Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 109–11, 88 S.Ct. 733, 737–38, 19 L.Ed.2d 936 (1968). Rigid, formalistic approaches to rule 19(b) were rejected, and instead the Court required the district courts to undertake a "practical examination of the circumstances" to determine whether the action may "in equity and good conscience" proceed without the absent party. 390 U.S. at 119–20 n. 16, 88 S.Ct. at 743 n. 16. See also, Fetzer v. Cities Service Oil Co., 572 F.2d 1250, 1253 (8th Cir.1978).

In support of their argument that the United States is an indispensable party to this action, defendants rely on cases in which the central issue is the legality of the United States' actions in facilitating the alienation of Indian land. The principal case on which defendants rely is Nichols v. Rysavy, 809 F.2d 1317 (8th Cir.), cert. denied, 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 103 (1987). Nichols was a consolidated appeal of fourteen cases. The claim in each case was that the United States had wrongfully issued fee patents to the plaintiffs' ancestors and, as a result, all later transfers of the properties were void. 809 F.2d at 1320. The United States Court of Appeals for the Eighth Circuit noted that in a prior case it found the United States, as the allotting agent, to be the appropriate defendant in suit to determine whether an Indian should have received a fee patent. 809 F.2d at 1333. The court of appeals agreed with the appellees that it seemed "absurd" to argue that the United States was not an indispensable party to the action. Id.

In Navajo Tribe of Indians v. State of New Mexico, 809 F.2d 1455 (10th Cir.1987), a tribe sought to have certain executive orders which returned unallotted land to the public domain declared null and void. The tribe claimed that the executive orders violated a statute which required that land be allotted to all of the tribe's members before unallotted land was returned to the public domain. 809 F.2d at 1462. The United States was held to be an indispensable party because the tribe's claims were, " 'in reality, challenges to the validity of the transactions by which the United States assumed title to the subject land.' " 809 F.2d 1471 (quoting the district court's order).

In Oglala Sioux Tribe v. United States, 650 F.2d 140 (8th Cir.1981), cert. denied, 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982), the Oglala Tribe filed suit alleging that the United States unconstitutionally exercised its power of eminent domain when it took the Black Hills. The district court dismissed the complaint against the United States for lack of jurisdiction and dismissed the claims against the remaining defendants for failure to join the United States as an indispensable party. 650 F.2d at 142. On appeal, the Eighth Circuit affirmed without discussing the dismissal of the nonfederal defendants. In a subsequent case involving the same claims in different dress, the court of appeals made clear that it found the 19(b) dismissal proper. Oglala Sioux Tribe v. Homestake Mining Co., 722 F.2d 1407, 1411 (8th Cir. 1983).

Finally, defendants cite *Manypenny v. United States*, 125 F.R.D. 497 (D.Minn. 1989). In *Manypenny*, plaintiffs sued the United States and numerous private parties seeking land whose title was clouded, in large part, by the federal government's issuance of fee patents to allotees in arguable violation of federal statute. *See* 125 F.R.D. at 502 and an earlier slip opinion (Case No. 4–86–770) dated Feb. 12, 1988 at 3–6. The district court dismissed the claims against the United States on various grounds and subsequently dismissed the claims against the remaining parties pursuant to rule 19(b). In reaching that result, the court relied on *Nichols* where the Eighth Circuit found the United States an indispensable party because the merits of plaintiff's claim depended " 'entirely on whether the United States acted legally or illegally.' " 125 F.R.D. at 501, *quoting Nichols*, 809 F.2d at 1333. In *Manypenny*, as in *Nichols*,

> a judgment on the merits in favor of plaintiffs would necessarily involve a finding that the federal government breached its trust responsibilities, [therefore] this litigation cannot properly proceed without joining the United States as a defendant to protect its interests.

125 F.R.D. at 502.

In each of the cases cited by defendants, the plaintiffs' claim was ultimately a dispute about the legality of actions taken by the United States. That is not the case in this action, as the Band points out.[4] In no respect does the Band challenge the legality of the federal government's acts. The Band seeks an adjudication of the interest granted to the railroad in the subject lands. If it was an easement, beneficial title would have remained with the Band. If it was a fee interest, the Band was divested of its interest in the land.

The courts have generally held that the United States is not an indispensable party when an Indian tribe or individual sues a third party to establish title or recover possession of land. 3A *Moore's Federal Practice* ¶ 19.09[8]. A number of cases, analogous to this one, so hold. *Puyallup Indian Tribe v. Port of Tacoma*, 717 F.2d 1251 (9th Cir.1983), *cert. denied*, 465 U.S. 1049, 104 S.Ct. 1324, 79 L.Ed.2d 720 (1984), involves an interesting set of facts. The Puyallup Tribe was situated in a reservation that encompassed land near the mouth of the Puyallup River. Over the course of 100 years, most of the reservation was allotted and passed into individual ownership. The Port of Tacoma took title to the allotments abutting one bank of the river. From 1948 through 1950, the United States Army Corps of Engineers "straightened" the Puyallup River. As a result, a twelve-acre tract of former riverbed was exposed. The Port of Tacoma took possession of this new land and leased it to industrial tenants. In 1980, the tribe filed suit claiming beneficial title to the former riverbed based upon an 1857 executive order which had extended the reservation to encompass part of the Puyallup River.

The district court denied the defendant's motion to dismiss for failure to join the United States as an indispensable party. On appeal, after the district court had ruled that title laid with the tribe, the court affirmed that holding.

> The United States, as the trustee holding legal title to all real property owned by the Tribe, obviously has an interest in this litigation and it will not be bound by any decree ensuing from this litigation unless it is formally joined as a party. Absent joinder of the United States, a judgment entered in this case in favor of the Port will not necessarily render complete relief to the Port or protect the Port from inconsistent judgments. Nonetheless, the rule is clear in this Circuit and elsewhere that, in a suit by an

---

4. The City of Baudette argues that this case does present a dispute against the United States by claiming that the historical record indicates that the federal government considered the grant to the railroad to be a grant of a fee interest. From that basis the City argues that the United States has taken a position in this dispute adverse to the Band. The City is wrong in its approach. Regardless of what the historical record indicates, any decision about the position of the United States in this litigation can only be made by the Department of Justice after a review of the record.

Indian tribe to protect its interest in tribal lands, regardless of whether the United States is a necessary party under Rule 19(a), it is *not* an indispensable party in whose absence litigation cannot proceed under Rule 19(b).

717 F.2d at 1254 (citations omitted, emphasis in original).

Another analogous case is *Bird Bear v. McLean County*, 513 F.2d 190 (8th Cir. 1975). That case involved Iris Bird Bear and Rosalie Bird Bear who were joint tenants of approximately 80 acres of land allotted to their father and held in trust by the United States. The Bird Bears sought compensation for a road easement granted in 1866, prior to the time the land which was to become their allotment had been made part of the reservation. The issue in the case was whether the easement was divested by the subsequent allotment. The United States was not joined as a party. On appeal, defendants argued for the first time that rule 19(b) mandated dismissal. The court of appeals found that the United States was not an indispensable party under the facts and circumstances in the case. 513 F.2d at 191–92 n. 6.

In *Choctaw and Chickasaw Nations v. Seitz*, 193 F.2d 456 (10th Cir.1951), *cert. denied*, 343 U.S. 919, 72 S.Ct. 676, 96 L.Ed. 1332 (1952), two Indian nations sued four private individuals who claimed an interest in land alleged to be "part of an unallotted common domain" of the nations. The district court had dismissed the action against the defendants for failure to join the United States as an indispensable party. The court of appeals reversed.

> Since, unless the United States becomes a party to the action it will not be bound by any judgment entered therein, a judgment entered as between the Nations and the defendants below would not radically and injuriously affect the interest of the United States. The question then narrows to whether a judgment could be entered as between the Nations and the defendants below which would be consistent with equity and good conscience.

193 F.2d at 458. After analyzing the practical effect of both allowing and not allow-

ing the suit to proceed, the court of appeals concluded that "the equities … and the inconveniences" weighed heavily in favor of allowing the parties' claims to title to be adjudicated. 193 F.2d at 460–61.

Other analogous cases include: *Fort Mojave Tribe v. LaFollette*, 478 F.2d 1016 (9th Cir.1973) (United States was not an indispensable party in action by Indian tribe against private parties to quiet title to land claimed under Executive Order); *Skokomish Indian Tribe v. France*, 269 F.2d 555 (9th Cir.1959) (same); *Jackson v. Sims*, 201 F.2d 259 (10th Cir.1953) (United States not a necessary party to an action for construction of statutory prohibitions upon the leasing of allotted lands and to prevent a contemplated alienation); *State of Wisconsin v. Baker*, 464 F.Supp. 1377 (W.D.Wis.1978) (United States not an indispensable party to a declaratory judgment action brought by state against Indian tribal governing board, seeking a declaration that the tribe's promulgation of a conservation code infringed upon the public's right to fish); and *Oneida Indian Nation of New York State v. County of Oneida*, 434 F.Supp. 527 (N.D.N.Y.1977) (United States not an indispensable party in action to recover damages for use of land originally purchased by state in a transaction that allegedly violated the Indian Nonintercourse Act), *aff'd*, 719 F.2d 525 (2d Cir.1983), *aff'd in part, rev'd in part*, 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985).

The holdings in these cases derive from Supreme Court precedent establishing that Indian tribes and individuals could sue to protect their interest in allotted land independent of the federal government, despite restrictions preventing those tribes and individuals from selling or leasing that land without the consent of federal officials. *Poafpybitty v. Skelly Oil Co.*, 390 U.S. 365, 370–71, 88 S.Ct. 982, 984–85, 19 L.Ed.2d 1238 (1968); *Creek Nation v. United States*, 318 U.S. 629, 640, 63 S.Ct. 784, 789, 87 L.Ed. 1046 (1943); *Lane v. Pueblo of Santa Rosa*, 249 U.S. 110, 113, 39 S.Ct. 185, 186, 63 L.Ed. 504 (1919).

An analysis of the four interests identified in *Provident Tradesmens* as relevant

to determining whether an action should proceed in the absence of a party confirms the conclusion that the United States is not an indispensable party to this action. The first interest to be examined is the plaintiff's interest in having a forum. The Band does have a case under the Indian Claims Act, formerly codified at 25 U.S.C. § 70, *et seq.*, pending before the United States Claims Court. At oral argument, however, this case was described as an action for an accounting of the moneys collected and disbursed in trust for the Band under the Nelson Act. *See also, Red Lake Band v. United States,* 17 Cl.Ct. 362 (1989). The action apparently includes a claim that the Band did not receive fair market value for the lands sold under the Nelson Act. No evidence has been presented to indicate that the question at issue here has been presented to the claims court or will necessarily be reached by that court. While it appears conceivable that the claims court would reach the question at issue in this case, without some indication that the Band's claim is at least likely to be adjudicated by the claim court, the first *Provident Tradesmens* factor favors plaintiff.

The second factor is the defendants' interest in avoiding multiple litigation, inconsistent relief or sole responsibility for a shared liability. There is a possibility of inconsistent rulings if the claims court should determine what interest was granted to the railroad. However, as stated above, it is far from clear that the claims court will reach that question. Thus, this factor also favors plaintiff.

The third factor is the interest of the absent party. The United States has two types of interest in this case. First, there is its interest as a trustee for the Band. The cases discussed above establish that the United States' status as a trustee does not justify a finding that the United States is an indispensable party to this action. *See, e.g., Puyallup,* 717 F.2d at 1254; *State of Wisconsin v. Baker,* 464 F.Supp. at 1384–85. The second type of interest is an interest in land. The United States holds a lease to the customhouse and also a flowage easement on the subject parcel. The extent to which these interests may be

prejudiced by this action is not yet clear. Because the United States is not a party, it cannot be bound by a judgment in this action. Yet while the judgment can have no legal effect on the United States, it may nevertheless have practical consequences for the United States. *See* Reed, *Compulsory Joinder of Parties in Civil Actions,* 55 Mich.L.Rev. 327, 336 (1957). To the extent possible, the Court will seek to minimize any prejudice to the United States "by protective provisions in the judgment, by the shaping of relief, or other measures." Fed.R.Civ.P. 19(b). Because it is not yet possible to evaluate the risk to the interests of the United States, this factor cannot be said to favor either plaintiff or defendants.

The fourth factor is the public interest in the complete, consistent and efficient settlement of controversies. This is not a case like *Nichols* which involved a challenge to the allotment system and could therefore result in a cloud on title to millions of acres of land. 809 F.2d at 1333. The claim in this case is restricted to a single parcel between forty and sixty acres in size. The public interest in having the Band's claim adjudicated clearly outweighs any contrary interest in efficiency. Thus, the final factor also favors plaintiff.

On the basis of the above analysis, defendants' motion to dismiss the Band's claims for failure to join the United States as an indispensable party will be denied.

II. *Whether the Eleventh Amendment Bars the Band's Claim against Minnesota*

■ The eleventh amendment provides:

[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Supreme Court decisions have interpreted the sovereign immunity conferred by the amendment to extend beyond the amendment's literal terms. Thus "an unconsent-

ing State is immune from suits brought in federal court by her own citizens as well as by citizens of another State." *Employees v. Missouri Public Health & Welfare Department,* 411 U.S. 279, 280, 93 S.Ct. 1614, 1616, 36 L.Ed.2d 251 (1973). *See also Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). In addition, the eleventh amendment not only bars suits against a state and its departments or agencies, but also against state officials where the relief sought would operate against the sovereign. *Hawaii v. Gordon,* 373 U.S. 57, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963) (per curiam). A judgment is deemed to operate against the state if it would expend itself on the public treasury, interfere with public administration, restrain the government from acting, or compel it not to act. *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963).

▬▬ The State of Minnesota argues that the eleventh amendment bars the claims asserted against it in this case. The Band contends that 28 U.S.C. § 1362, which provides the jurisdictional basis for this action, constitutes a statutory abrogation of the state's eleventh amendment immunity from suits brought by Indian tribes. Congress has the power, under section five of the fourteenth amendment, to authorize suits against states or state officials that would otherwise be barred by the eleventh amendment. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 457, 96 S.Ct. 2666, 2672, 49 L.Ed.2d 614 (1976). As authority for their argument, plaintiffs are able to cite decisions by the Second and Ninth Circuits which interpret section 1362 to authorize suits by Indian tribes against the states. These opinions rely on a Supreme Court case, *Moe v. Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), which suggested "that in certain respects" section 1362 accorded Indian tribes a right to suit coextensive with the United States' power to sue on their behalf. However, in a decision issued before *Moe,* the Eighth Circuit held that there was no basis for inferring that section 1362 abrogated the eleventh amendment. *Standing*

*Rock Sioux Indian Tribe v. Dorgan,* 505 F.2d 1135, 1140 (8th Cir.1974).

The suit in *Dorgan* was precipitated by a decision from the Supreme Court of North Dakota that the collection of state sales and use taxes from Indians on tribal reservations violated the Constitution, laws and treaties of the United States. The Standing Rock Sioux Tribe subsequently filed suit in federal court against North Dakota's tax commissioner to recover the state sales and use taxes illegally collected from its members. Jurisdiction was based upon 28 U.S.C. §§ 1362 and 1343(3). Section 1362 provides:

> The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter of controversy arises under the Constitution, laws, or treaties of the United States.

The Eighth Circuit found that the legislative intent behind section 1362 was "to authorize Indian tribes to bring suits in federal court to protect their federally derived property rights in those situations where the United States [could have initiated suit in its capacity as trustee but] declined to act on their behalf." 505 F.2d at 1140. The court held, however, that section 1362 only conferred jurisdiction where the complaint alleged that the United States is "the real party in interest." *Id.* Absent such an allegation, it was deemed that section 1362 "cannot elevate the Tribe to a position equivalent to that of the United States." *Id.* Moreover, the court of appeals found that because the federal government had not waived its own sovereign immunity through section 1362, there was "certainly no basis for inferring that this statute abrogated the sovereign immunity of the several states." *Id.*

Two years later, the Supreme Court decided *Moe. Moe* involved a challenge by an Indian tribe and some of its members to the application of Montana's cigarette sales tax, personal property taxes, and a vendor licensing statute on the reservation. The issue presented was whether the suit was

barred by 28 U.S.C. § 1341, which prohibits the federal district courts from enjoining "the assessment, levy or collection of any tax under State law...."

The Court found that suit by the tribe was not barred, relying on section 1362. In that section, the Court found

an indication of a congressional purpose to open the federal courts to the kind of claims that could have been brought by the United States as trustee, but for whatever reason were not so brought.

425 U.S. at 472, 96 S.Ct. at 1641. The Court held that the tribe could pursue the action against the state because the United States was not barred by section 1341 from seeking to enjoin the enforcement of a state tax law.

We think that the legislative history of § 1362, though by no means dispositive, suggest that in certain respects tribes suing under this section were to be accorded treatment similar to that of the United States had it sued on their behalf.

425 U.S. at 474, 96 S.Ct. at 1641–42.

*Moe* did not discuss whether section 1362 abrogated the sovereign immunity conferred upon the states by the eleventh amendment. However, relying on *Moe*, both the Second and Ninth Circuits have concluded that, in enacting section 1362 to provide Indian tribes "with a capacity to sue that is as broad in some respects as that to the United States," Congress intended to remove the states' eleventh amendment immunity to suits brought by tribes. *Oneida Indian Nation of New York v. State of New York*, 691 F.2d 1070, 1080 (2d Cir.1982); *Native Village of Noatak v. Hoffman*, 872 F.2d 1384 (9th Cir. 1989) (motion for reconsideration en banc pending).

Most of the district courts which have considered the issue after *Moe* have also found section 1362 to limit the protection afforded by the eleventh amendment. *Lac Courte Oreilles Band v. State of Wisconsin*, 595 F.Supp. 1077, 1078–81 (D.Wis. 1984); *Cayuga Indian Nation v. Cuomo*, 565 F.Supp. 1297, 1307 (N.D.N.Y.1983) (governed by *Oneida, supra*); *Charrier v. Bell*, 547 F.Supp. 580, 585 (M.D.La.1982);

*Oneida Indian Nation of New York v. State of New York*, 520 F.Supp. 1278, 1301–08 (N.D.N.Y.1981), *aff'd in part, rev'd in part*, 691 F.2d 1070 (1982); *Confederated Tribes of the Colville Indian Reservation v. State of Washington*, 446 F.Supp. 1339, 1350 (E.D.Wash.1978), *aff'd in part and rev'd in part on other grounds*, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980); *Aquilar v. Kleppe*, 424 F.Supp. 433, 436 (D.Alaska 1976) (dictum).

The State of Minnesota cites two cases as holding to the contrary. In one of those cases, section 1362 was found inapplicable because the suit was brought by a group of individuals, not the tribe. *Osceola v. Department of Revenue*, 705 F.Supp. 1552, 1554 (S.D.Fla.1989). The other case did hold that section 1362 did not abrogate the eleventh amendment, on the grounds that the statute does not contain a sufficiently clear statement of legislative intent to achieve that end. *Native Village of Venetie v. State of Alaska*, 687 F.Supp. 1380, 1385–86 (D.Alaska 1988). That holding has, in effect, been overruled by the United States Court of Appeals for the Ninth Circuit in the decision discussed above, *Native Village of Noatak v. Hoffman*, 872 F.2d 1384 (9th Cir.1989).

In *Hoffman*, the Ninth Circuit analyzed the Eighth Circuit's opinion in *Dorgan* and found it unpersuasive. The court pointed out that (a) the United States' right to act as a trustee of Indian tribes is not limited to protecting "federally derived property rights," (b) it is inconsistent to require that the United States be "the real party in interest" while acknowledging that if the United States sued it would sue as a trustee with the real interest necessarily being that of the tribal beneficiaries, and (c) the states' sovereign immunity does not parallel the immunity of the federal government. 872 F.2d at 1388. Given *Moe* and *Hoffman*, the Eighth Circuit will have to address the question of whether section 1362 limits the states' immunity from suit anew and there is every reason to believe that it will adopt the position taken by the Second and Ninth Circuits. The Court will therefore hold that the State of Minnesota

is subject to suit by the Band under section 1362 and deny the motion for summary judgment.

Accordingly, based on the foregoing, and upon all the files, records and proceedings in this case,

IT IS ORDERED that:

1. defendants' motion to dismiss for failure to join an indispensable party is denied;

2. the motion by the State of Minnesota to dismiss the claims asserted against it as barred by the eleventh amendment is denied.