## UNITED STATES v. BRINDLE.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

Argued January 18th, 1884.—Decided March 3d, 1884.

*Office—Public Lands—Salary—Statutes.*

A receiver of public moneys for a district of public lands subject to sale where the annual salary is $2,500, is only entitled to retain from the military bounty-land fees received by him during his term of office sufficient, with his commissions on cash sales of public lands, to make up his annual salary. *United States* v. *Babbit*, 1 Black, 55, adhered to.

A receiver of moneys from the sale of public lands whose annual salary amounted to $2,500, was also appointed agent for the sale of Indian trust lands under the treaty of July 17th, 1854, with the Delaware Indians, 10 Stat. 1048: *Held*, That he was entitled to commissions on the sales of Indian lands made by him, although they increased his annual compensation to a greater amount than $2,500.

§ 18 of the Act of August 31st, 1852, 10 Stat. 100 [Rev. Stat. § 1763], which provided that "no person hereafter who holds or shall hold any office under the government of the United States, whose salary or annual compensation shall amount to the sum of $2,500, shall receive compensation for discharging the duties of any other office," did not forbid the allowance of extra

compensation to such an officer for the performance of duties not imposed upon him by an office under the government of the United States. *Converse* v. *The United States,* 21 How. 463, cited and approved to this extent.

The plaintiff in error as plaintiff below sued the defendant to recover a balance claimed to be in his hands as receiver of moneys from the sale of public lands in Kansas. The defendant answered, denying liability, and setting up a claim to commissions on the amount received by him from sales of public lands, and also a claim to commissions on amounts received by him from sales of Indian lands. The latter claim was set up on sales made by him as agent under the treaty of July 17th, 1854, with the Delaware Indians, 10 Stat. 1048.

A *pro forma* judgment was entered below for the defendant. The plaintiff below brought the cause here by writ of error.

*Mr. Assistant Attorney-General Maury* for plaintiff in error.

*Mr. M. F. Morris* (*Mr. R. T. Merrick* and *Mr. John H. Sloane* were with him), for defendant in error.

Mr. CHIEF JUSTICE WAITE delivered the opinion of the court.

Two general questions arc presented by the special verdict in this case:

1. Whether Brindle, the defendant in error, as receiver of public moneys for the district of lands subject to sale at Lecompton, Kansas, is entitled to the military bounty-land fees received by him during his term of office, over and above the amount required, with his commissions on cash sales of public lands, to make up his annual salary of $2,500 per year; and, 

2. Whether he is entitled to commissions on sales of Indian trust lands in addition to his compensation as such receiver of public moneys.

The first of these questions is answered in the negative on the authority of *United States* v. *Babbit,* 1 Black, 55, decided in 1861, and reaffirmed in 1877. 95 U. S. 335. The rule settled in that case ought not to be disturbed at this late day.

The facts on which the claim for commissions on sales of Indian trust lands depend are these:

On the 17th of July, 1854, a treaty was concluded with the

Delaware tribe of Indians, 10 Stat. 1048, the material parts of which are as follows :

"Art. 1. The Delaware tribe of Indians hereby cede, relinquish, and quit-claim to the United States all their right, title, and interest in and to their country," describing it, and also their right, title, and interest in what was then known as "the outlet."

"Art. 2. The United States hereby agree to have the ceded country (excepting the said 'outlet'), surveyed, as soon as it can be conveniently done, in the same manner that the public lands are surveyed, such survey to be commenced and prosecuted as the President of the United States may deem best. And the said President will, so soon as the whole or any portion of said lands are surveyed, proceed to offer such surveyed lands for sale, at public auction, in such quantities as he may deem proper, being governed in all respects, in conducting such sales, by the laws of the United States respecting the sales of public lands ; and such of the lands as may not be sold at the public sales, shall thereafter be subject to private entry, in the same manner that private entries are made of United States lands ; and any, or all, of such lands as remain unsold after being three years subject to private entry, at the minimum government price, may, by act of Congress, be graduated and reduced in price, until all said lands are sold ; regard being had in said graduation and reduction to the interests of the Delawares, and also to the speedy settlement of the country.

"Art. 3. The United States agree to pay to the Delaware tribe of Indians the sum of ten thousand dollars ; and, in consideration thereof, the Delaware tribe of Indians hereby cede, release, and quit-claim to the United States, the said tract of country hereinbefore described as the 'outlet.' And as a further and full compensation for the cession made by the first article, the United States agree to pay to said tribe all the moneys received from the sale of the lands provided to be surveyed in the preceding article, after deducting therefrom the cost of surveying, managing, and selling the same."

Another article provided for the permanent investment of such of the proceeds as were not required for the present

wants of the Indians, and for the disposition of the interest on the investments.

On the 10th of August, in the same year, the Kaskaskias and Peorias, and certain tribes of the Piankeshaw and Wea Indians, ceded certain of their lands to the United States by a treaty the same in its general provisions as that of the Delawares. 10 Stat. 1082.

§ 5 of the act of March 3d, 1855, c. 204, 10 Stat. 700, passed after these treaties were concluded, is as follows:

" That to enable the President of the United States to carry out, in good faith, the recent treaties with the  .  .  .  Delawares  .  .  .  and the united tribes of Kaskaskias and Peorias, Piankeshaws and Weas,  .  .  .  there shall be, and hereby is, appropriated, the sum of twenty thousand dollars, in addition to the appropriations heretofore made, for the execution of the surveys required by said treaties ; and where the net proceeds of the lands ceded by either of said treaties are required to be paid over to the Indians, the President shall cause said lands, or such parts thereof as he may deem proper, to be classified and valued, and when such classification and valuation have been made to his satisfaction, he shall cause said lands to be offered at public sale, by legal subdivisions or town lots, at such times and places, and in such manner and quantity, as to him shall appear proper and necessary to carry out faithfully the stipulations in said treaties ; and said lands shall not be sold at private sale for a less price than that fixed by the valuation aforesaid, nor shall any land be sold at a less price than one dollar and twenty-five cents per acre, for three years, and thereafter as may be directed by law pursuant to the treaty."

By an act of July 9th, 1832, c. 174, 4 Stat. 564, as afterwards amended, and now § 463 of the Revised Statutes, the Commissioner of Indian Affairs, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, has the management of Indian affairs, and of all matters arising out of Indian relations. The same act (now § 462 Rev. Stat.) also provides that all accounts and vouchers for claims and disbursements connected

with Indian affairs shall be transmitted to the commissioner for administrative examination, and by him passed to the proper accounting officer of the Treasury Department for settlement. The Second Auditor of the Treasury is charged by law with the duty of receiving and examining all accounts relating to Indian affairs and transmitting them to the second comptroller for his decision thereon. Rev. Stat., § 277, subdivision second.

There must be appointed a register of the land office and a receiver of public moneys for each land district established by law, to reside at the place where the land office to which he is appointed is kept. Rev. Stat., §§ 2234, 2235, re-enacting other statutes to the same effect.

The Commissioner of the General Land Office has power to audit and settle all public accounts relating to the public lands, and to transmit the accounts and vouchers to the First Comptroller of the Treasury for his examination and decision thereon. Rev. Stat., § 456.

§ 18 of the act of August 31, 1852, "making appropriations for the civil and diplomatic expenses of the government," c. 108 10 Stat. 100, is as follows:

"No person hereafter who holds or shall hold, any office under the government of the United States, whose salary or annual compensation shall amount to the sum of two thousand five hundred dollars, shall receive compensation for discharging the duties of any other office."

On the 24th of October, 1856, Brindle, the defendant in error, "was duly appointed special receiver and superintendent to assist the special commissioner to dispose of the Delaware Indian trust lands at Fort Leavenworth, in the Territory of Kansas, under the treaty with the Delaware tribe of Indians." On the 18th of February, 1857, he was appointed and commissioned for four years as receiver of public moneys for the district of lands subject to sale at Lecompton, Kansas, and on the 15th of May, 1857, he was duly appointed as special receiver and superintendent to assist the special commissioner to dispose of the trust lands of the Kaskaskia and Peoria, Piankeshaw

and Wea Indian confederated tribes of Indians at Paoli, Kansas Territory.

These Indian trust lands were never public lands of the United States, and were never subject to sale at the Lecompton land office. The cessions to the United States were in trust, to survey, manage and sell the lands and pay the net proceeds to or invest them for the Indians. There was never a time that the United States occupied any other position under the cessions than that of trustees, with power to sell for the benefit of the Indians. In equity, under the operation of the treaties, the Indians continued, until sales were made, the beneficial owners of all their country ceded in trust. Of this we have no doubt. The treaties are full of evidence to that effect. It is unnecessary to state it in detail.

It follows that it was never any part of the official duty of Brindle, as receiver of public moneys at the Lecompton land office, to sell the trust lands or receive the payments therefor. His duties in connection with that office were to receive and account for moneys paid for public lands, that is to say, the public moneys of the United States derived from the sales of public lands. The moneys paid for the Indian lands were trust moneys, not public moneys. They were at all times in equity the moneys of the Indians, subject only to the expenses incurred by the United States for surveying, managing, and selling the lands.

When, therefore, Brindle was appointed special receiver and superintendent, to assist the special commissioner in disposing of the trust lands, he was employed to render a service in no way connected with the office he held. He was not appointed to any office known to the law. No new duty was imposed on him as receiver of the land office. The President was, both by the treaties and the act of 1855, charged with the duty of selling the lands, and under his instructions Brindle was employed to assist in that work. By express provisions in the treaties the expenses incurred by the United States in making the sales were to be paid from the proceeds. This clearly implied the payment of a reasonable compensation for the services of those employed to carry the trust into effect.

_n *Converse* v. *United States*, 21 How. 463, it was decided that provisions in appropriation acts, like section 18 of the act of August 31st, 1852, prohibiting an officer from receiving more than one salary, could not by "fair interpretation be held to. embrace an employment which has no affinity or connection, either in its character or by law or usage, with the line of his official duty, and where the service to be performed is of a different character and for a different place, and the amount of compensation regulated by law." P. 471. In the present case the employment was for a special service in connection with a special trust assumed by the United States for the benefit of certain Indian tribes, in which express provisions were made for the payment of expenses. In legal effect, the appointment was to an agency for the sale of lands for the Indians, with an implied understanding that a reasonable compensation would be paid for the services rendered. So far as anything appears in the record, the appointment was not made because Brindle was receiver of the land office. The duties to be performed were of a different character and at a different place from those of the land office, and while the exact amount of compensation for this service was not fixed, it was clearly to be inferred that such compensation as the law implies where labor is performed by one at the request of another, that is to say, a reasonable compensation, would be paid. This case comes, therefore, within the rule in *Converse* v. *United States*, and Brindle is not excluded by the act of 1852 from demanding compensation for this service by reason of his being receiver of the land office.

What we have already said disposes of one of the incidental questions presented by the verdict, to wit, whether the first or second Comptroller of the Treasury was the proper officer under the law to state the accounts of Brindle as special receiver, &c. As the lands were Indian lands and the accounts related to and were connected with Indian affairs, the law required them to be transmitted to the Commissioner of Indian Affairs, to be passed by him to the second auditor, and by him to the second comptroller for examination and certificate of the balances arising thereon. This disposes of all the questions presented in the argument.

It follows that the judgment in favor of Brindle for
$50,979.19 was erroneous, and that it should have been for
$14,541.78, according to the alternative finding marked G in
the special verdict.

> *The judgment is therefore reversed, and the cause remanded
> with instructions to enter another judgment in favor of
> the defendant in error in accordance with the finding G ;
> that is to say, for $14,541.78, as of June 13th, 1879, the
> date of the verdict, the judgment to draw interest from that
> date.*