UNITED STATES v. ROGERS et al.

(Circuit Court of Appeals, Ninth Circuit. July 1, 1897.)

No. 343.

**PUBLIC LANDS—RECEIVER OF PUBLIC MONEYS—LIABILITY OF SURETIES.**
The sureties in the bond of a receiver of public moneys at a land office are not liable for moneys received by him as proceeds of the sale of Indian lands made under the act of congress of September 1, 1888, as such moneys are at all times, in equity, the moneys of the Indians, and not public moneys.

In Error to the Circuit Court of the United States for the District of Idaho.

James H. Forney, U. S. Atty.

Charles A. Wilson, for defendants in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. The plaintiff in error, as plaintiff in the court below, sued the defendants as sureties upon the official bond of one William H. Danilson, given as receiver of public moneys at the United States land office at Blackfoot, Idaho, pursuant to the laws of the United States. The penal sum of the bond is $15,000, and its condition is that, if Danilson "shall faithfully execute and discharge his duties as receiver aforesaid, and faithfully disburse all public moneys, and honestly account, without fraud or delay, for the same, and for all public funds or property which shall or may come into his hands, then the said obligation to be void, and of no effect; otherwise to remain in full force and virtue." The amount sued for is $270, and, according to the agreed statement of facts, it constituted a portion of the proceeds of the sale of certain Indian lands, made under and by virtue of the act of congress of September 1, 1888 (25 Stat. 452), and was retained by Danilson out of those proceeds as compensation for his services rendered in the matter of the sale, pursuant to a letter of the commissioner of the general land office of date March 28, 1891, which recited that the act providing for the sale of the lands made no provision for the receipt of the proceeds, and directing the said Danilson to go to the place of sale (Pocatello,—about 25 miles distant from the land office), and to remain there during the sale of the lands, and to receive the moneys

arising therefrom; and further stating that he (Danilson) and one P. J. Anson, register of the land office at Blackfoot, should receive five dollars per day for each day engaged in the sale; and further providing that all costs, clerk hire, mileage, and other expenses incident to the sale should be charged to and paid out of the fund arising therefrom. The agreed statement of facts further shows that, pursuant to that letter of instructions, Anson remained in Pocatello, engaged in and about the sale, 23 days, and Danilson 31 days; that neither Anson nor Danilson received any pay for their services, nor mileage, nor reimbursement for any expenses in going to Pocatello, nor for their expenses while there engaged in the sale of the lands; that the expenses of each of them while so engaged was three dollars per day, and that five dollars per day each for their services in the matter of the sale of the land is a reasonable compensation, in the event any compensation is allowable by law.

The act of September 1, 1888, was an act to accept and ratify an agreement made with the Shoshone and Bannock Indians for the surrender and relinquishment to the United States of a portion of the Ft. Hall reservation, in the territory of Idaho, for the purposes of a town site, and for the grant of a right of way through the reservation to the Utah Northern Railway Company, and for other purposes. By the agreement so ratified, the Indians agreed to surrender and relinquish to the United States all their estate, right, title, and interest in and to a certain portion of the reservation, which land, so relinquished, in the event it should be found necessary, was to be surveyed·by the United States, and laid off into lots and blocks as a town site, and, after due appraisement thereof, to be sold at public auction to the highest bidder, at such time, in such manner, and upon such terms and conditions as congress should direct. The funds arising from the sale of such lands, after deducting the expenses of survey,· appraisement, and sale, the act declared should be "deposited in the treasury of the United States to the credit of the said Indians, and to bear interest at the rate of five per centum per annum; with power in the secretary of the interior to expend all or any part of the principal and accrued interest thereon for the benefit and support of said Indians, in such manner and at such times as he shall see fit. Or said lands so relinquished to be disposed of for the benefit of said Indians in such other manner as congress may direct."

By section 2 of the act it was provided that the secretary of the interior should cause to be surveyed and laid out into lots and blocks so much of the ceded portion of the reservation, at or near Pocatello station on the Utah Northern Railway, as should be found to be within certain described lines; and by subsequent provisions of the act the secretary of the interior was required to cause the lots and blocks to be appraised in a certain manner, and thereafter cause the same to be offered for sale at public auction at the door of the Pocatello House, Pocatello Junction, to the highest bidder for cash, and to be advertised for a certain time and in such manner as the secretary should direct, and to be "conducted by the register of the land office in the district in which said lands are situate, in accord-

ance with the instructions of the commissioner of the general land office"; the sale to continue from day to day until all the lands should be sold or offered for sale.

By section 6 it was provided:

"That the funds arising from the sale of said lands, after deducting the expenses of surveys, appraisement, and sale, shall be deposited in the treasury of the United States to the credit of the Shoshone and Bannock tribes of Indians belonging on said reservation, and shall bear interest at the rate of five per centum per annum; and the secretary of the interior is hereby authorized and empowered to expend all or any part of the principal and accrued interest on such fund, for the benefit and support of said Indians, in such manner and at such times as he may deem expedient and proper."

Section 7 is as follows:

"That the secretary of the interior shall make all needful rules and regulations necessary to carry this act into effect; he shall determine the compensation of the surveyor for his services in laying out said lands into town lots, also the compensation of the appraisers provided for in section 4, and shall cause patents in fee simple to be issued to the purchasers of the lands sold under the provisions of this act, in the same manner as patents are issued for the public lands."

The lands thus relinquished to the United States for the purposes stated were not public lands subject to sale at the land office at which Danilson was receiver. Their relinquishment, like the cessions involved in U. S. v. Brindle, 110 U. S. 688, 4 Sup. Ct. 180, was made to the government in trust to survey and sell the lands, and pay the net proceeds to, or invest them for, the Indians. What was said by the supreme court in the case cited in respect to the receiver of public moneys at the Lecompton land office is equally applicable here. It was never any part of the duty of Danilson, as receiver of the public moneys at the Blackfoot land office, to sell the trust lands, or receive the payments therefor. His duties in connection with that office "were to receive and account for moneys paid for public lands; that is to say, the public moneys of the United States derived from the sales of public lands. The moneys paid for the Indian lands were trust moneys, not public moneys. They were at all times, in equity, the moneys of the Indians, subject only to the expenses incurred by the United States for surveying, managing, and selling the land." These trust moneys constituted no part of the public moneys or property for which the defendants, as sureties upon the bond of Danilson, became responsible. It results that the judgment must be, and accordingly is, affirmed.