**RED LAKE BAND OF CHIPPEWA INDIANS, Plaintiff,**

v.

**CITY OF BAUDETTE, MINNESOTA, a municipal corporation; Independent School District No. 386, Successor in Interest to Independent School No. 111, a municipal corporation; State of Minnesota; Canadian National Railroad Company, a corporation, successor in interest to the Minnesota and Manitoba Railroad Company, a corporation; Minnkota Power Cooperative, Inc., a corporation; First National Bank of Baudette, a corporation; Baudette Oil Co., Inc., a corporation; Co-Op Service, Inc., of Baudette, a corporation; Larry Larson, dba Rapid River Grain and Seed Company; Howard Mord, dba Howard's Oil Company; Elwood L. Dahl and Lloydeen E. Dahl, dba Phillips 66; Robert E. Schuler dba Schuler Company; and Exports, Inc., Defendants.**

Civ. No. 4–89–719.

United States District Court, D. Minnesota, Fourth Division.

May 31, 1991.

Marvin J. Sonosky, Rodney J. Edwards, James F. Bodin, Duluth, Minn., Sonosky, Chambers & Sachse, Washington, D.C., for plaintiff.

John E. Jacobson, Jacobson Law Office, Minneapolis, Minn., for defendants City of Baudette and Independent School Dist. 386.

Hubert H. Humphrey, III, Minn. Atty. Gen., and Gail I. Lewellan, Asst. Atty. Gen., St. Paul, Minn., for defendant State of Minn.

Gilbert W. Harries, Hanft, Fride, O'Brien, Harries, Swelbar & Burns, Duluth, Minn., Philip A. Nacke, Hopkins, Sutter, Hamel & Park, Washington, D.C., for defendants Canadian Nat. R.R. and Minnesota & Manitoba Ry.

John P. Bailey, Bailey Law Office, Bemidji, Minn., for defendant Minnkota Power Co-op.

Daniel C. Adams, Bowman & Brooke, Minneapolis, Minn., Jeffrey R. Ansel, Timothy K. Masterson, Winthrop & Weinstine, St. Paul, Minn. for defendant First Nat. Bank of Baudette.

Richard A. Saliterman, Saliterman & Siefferman, Minneapolis, Minn., for defendant Exports, Inc.

Jerome G. Arnold, U.S. Atty., and Mary E. Carlson, Asst. U.S. Atty., Minneapolis, Minn., for amicus curiae U.S.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on defendants' motions for summary judgment granting judgment for defendants as a matter of law. The motions will be granted.

FACTS

This is an action brought by the Red Lake Band of Chippewa Indians (the Band) to quiet title to land in and around Baudette, Minnesota. The land at issue is referred to as Government Lots 3 and 4.[1]

A. *The Nelson Act*

The Nelson Act of January 14, 1889 (Nelson Act), Ch. 24, § 1, 25 Stat. 642, authorized the United States to negotiate with various bands of Chippewa Indians in Minnesota, including the Red Lake Band of Chippewa Indians, for cession to the United States of approximately 3,669,200 acres of tribal lands, of which the Red Lake Band ceded approximately 2,905,921 acres, including Lots 3 and 4. Section 4 of the Nelson Act classified the lands in question as either "pine lands" or "agricultural lands." The pine lands were to be appraised and sold. The agricultural lands, however, were to be disposed of to homesteaders at the rate of $1.25 per acre. The proceeds from the disposal of these lands was to be placed in the United States Treasury to the credit of the Minnesota Chippewas for a fifty-year period with interest payable annually. Nelson Act, *supra*, § 7. The Act became effective when the Chippewa Bands assented to the cession, and the President approved.

B. *The Railroad Grant*

On April 17, 1900, the United States Congress granted to the Minnesota and Manitoba Railroad Company, its successors and assigns, "the right of way of said railroad, with necessary side tracks and switch tracks, and for telegraph and telephone lines, through the ceded lands of what was formerly the Red Lake Indian Reservation...."[2] Act of April 17, 1900, Ch. 193, 31 Stat. 134 (1900 Act). The railroad was also given the right to:

ground adjacent to such right of way for station buildings, depots, machine shops, side tracks, turn outs, turntables, water stations, and such other structures at such points as the said railroad company may deem to their interest to erect, not to exceed 300 feet in width and 3,000 feet in length for each station, to the extent of one station for each ten miles of road, except at the crossing of said Rainy River, at which point said railroad company may take not exceeding 40 acres in addition to the grounds allowed for station purposes for the corresponding section of ten miles....

*Id.* This grant is then immediately followed by the following proviso:

*Provided,* That no part of such lands herein granted shall be used except in such manner and for such purposes only as are necessary for the construction, maintenance and convenient operation of said railroad.

*Id.* The Act making the grant further provided that no right of any kind would vest in the railroad company to any part of the right of way until plats specifying the location of the railroad and station build-

---

**1.** The legal description of the land in dispute is:

Government Lots 3 and 4, Section 35, Township 161 North of Range 31 West of the Fifth Principal Meridian, Lake of the Woods County, Minnesota.

As noted in the Court's previous order dated February 2, 1990, the precise size of the land in dispute is unclear. An original survey filed in 1898 describes the size of the two lots as 59.25 acres while a later survey found that the lots constituted only 43.58 acres. The Court has not attempted to resolve this issue.

**2.** The railroad had previously attempted to apply for a right of way through the reservation to the Commissioner of Indian Affairs pursuant to the Act of March 2, 1899, Ch. 374, 30 Stat. 990. The request was denied because of limitations stated in the Nelson Act concerning the manner of the land's disposal and application of the proceeds. Affidavit of Richard A. Ifft, Exh. 4.

ings were approved by the Secretary of the Interior and until compensation was fixed and paid. The Act specified that damages resulting to Indian tribes in their tribal capacity by reason of the railroad's construction through ceded lands was to be ascertained by the Secretary of the Interior. 1900 Act § 2. The Act also provided that the rights granted therein would be "forfeited" by the company unless the railroad was constructed through the ceded lands within two years of the passage of the Act. 1900 Act, § 5.

On July 13, 1900, the railroad filed a map with the General Land Office showing the location of its line, station grounds, and the additional 40 acres at the crossing of the Rainy River. Affidavit of Richard A. Ifft Exh. 8. The land claimed on the plat includes Lots 3 and 4. The map contains the sworn statement of Hector Baxter, president of the railroad, that the map represents the "definite location of said tracks for station grounds" and "that, in his belief, the said grounds are actually and to their entire extent required by the company for the necessary uses contemplated by the act of Congress approved March 3, 1875 entitled 'An act granting to railroads the right of way through the public lands of the United States' also of the act of Congress approved April 17, 1900 entitled 'An act granting the right of way to the Minnesota and Manitoba Railroad Company across the ceded portion of the Chippewa (Red Lake) Indian Reservation in Minnesota.' " Endorsed upon the map is the following approval:

> Approved, subject to all the conditions, limitations and provisions of the Act of Congress of March 3, 1875, (18 Stats. 482) and of the act of Congress of April 17, 1900 (31 Stats. 134) and subject also to all valid existing rights.

*Id.*

After the map was filed, the Secretary of the Interior designated an agent to assess damages. The agent recommended that the Nelson Act provisions regarding value of the ceded lands be followed "in a general way." Ifft Aff. Exh. 10 at 4–5. The agent assessed damages payable to the Band in the amount of $1,458.26, assuming the Nelson Act rate of $1.25 per acre for 587.58 acres plus $463.80 for the value of spruce timbers and piles, and $260 for the value of 13,000 telegraph poles. The Secretary approved this schedule of damages on June 11, 1901. The plaintiff concedes that this sum was indeed paid by the railroad to the United States. Plaintiff's Proposed Findings of Fact, Finding 6; Ifft. Aff. Exh. 46 at 4, Plaintiff's Response to the Minnesota and Manitoba Railroad Company's Request for Admissions.

## C. *The Cathcart Dispute*

In the early 1890's, an individual by the name of Thomas Cathcart settled an area in Lots 3 and 4. On November 10, 1903, land in this vicinity was opened to settlement and entry under the homestead laws. *Cathcart v. Minnesota and Manitoba Railroad Co.*, 34 L.D. 619, 620, 625 (1906), Defendants' Statutory Appendix at 193. On November 13, 1903, Cathcart filed in the local land office his application to enter Lots 3 and 4 under the homestead laws. *Id.* at 621. His application was suspended pending disposition of a conflicting town site application. Suspension of Cathcart's application was appealed and a hearing set concerning the town site application. The railroad company protested the town site application, claiming that the United States government's approval of the railroad's map of right of way and station grounds made the railroad the fee owner of the lands in question. The case was continued for the purpose of taking the deposition of Hector Baxter, president of the railroad. On October 14, 1904, the local land office cited Baxter's testimony concerning the railroad's payment of $1,458.26 for the right of way, station grounds, and additional land (Lots 3 and 4), and further "that it was and still is the intention of the company to use all of the land taken at Baudette for terminal purposes, and that the company had never permitted the use of said land for other than railroad purposes." *Id.* at 621. Cathcart's testimony established that Cathcart was 73 years old, had made settlement in October of 1890, that he had built a house and cleared land and in 1891 moved

his family upon the land, and that he had resided there since. The testimony further established that the Village of Baudette then consisted of six stores, five saloons, three hotels, a meat market, school house and church combined, newspaper office, feed store, barbershop, brewing company, warehouse, depot and freight shed, and other buildings, all located within the railroad station grounds. *Id.* at 622.

The land office held that the money paid by the railroad to the government to the credit of the Band "was not a payment for the land taken as right of way and station grounds and the additional 40 acres at Baudette, but a payment made under section 2 of the act" for damages and "that by the payment of this sum of money to the government, *the title to the land did not pass from the government,* but the lands were simply granted to the company for railroad purposes, and that a subsequent entryman or claimant could take the lands only subject to the right of the railroad company to use those lands for railroad purposes." *Id.* at 622 (emphasis added). The local land office recommended that the town site application be rejected, the protest of the railroad company be dismissed, and that Cathcart be permitted to make homestead entry, subject to the rights of the railroad company for its right of way and station grounds. *Id.*

The town site applicants and the railroad appealed to the Commissioner of the General Land Office. The commissioner reversed, finding that the railroad company's rights vested on July 13, 1900, the date its map was approved, and that on that date the railroad acquired the right of exclusive possession. The commissioner concluded that settlement on the lands had been expressly prohibited by department circular as of August 11, 1899. The commissioner found that the railroad, by virtue of the grant made by Congress, holds a "conditional fee in the lands covered by the approved map of the definite location of its right of way and station grounds ... and that such a fee, as well as a fee simple,

leaves nothing in the United States which can be passed to another." *Id.* at 623. The commissioner further concluded that the railroad's rights were superior to any rights which Cathcart might have acquired.

Cathcart and the town site applicants then appealed to the Secretary of the Interior. The Secretary agreed with the commissioner's determination that Cathcart secured no rights to the land by reason of his settlement prior to the land opening, and that the railroad company's rights properly attached on July 13, 1900, upon filing of its map. *Id.* at 625. The Secretary noted that by approving the railroad's filing of its map, the Secretary adjudicated that the land subject to the map was needed for railroad purposes. *Id.* Further, the Secretary noted:

> And while it does not appear that said lots, outside of the right of way and station grounds, have as yet been used by the company in the construction, maintenance, and operation of its road, testimony was submitted to the effect that it was and still is the intention of the company to use the same for terminal purposes.

*Id.* The Secretary found that it was not necessary to determine whether the railroad company held a base fee or merely an easement, citing *Northern Pacific Railroad Co. v. Smith,* 171 U.S. 260, 18 S.Ct. 794, 43 L.Ed. 157 (1898). Under *Northern Pacific,* the Secretary found that until a forfeiture had been declared for misuser or nonuser the lots in question could not be entered by Cathcart. The Secretary further noted that the Court in *Northern Pacific* held that such forfeiture "could not be enforced in a private action." *Id.* at 625–26. The Secretary also affirmed the finding of the commissioner that the town site applicants had failed to establish the existence of a meritorious town site settlement prior to July 13, 1900. Accordingly, the commissioner's decision was affirmed, the town site application denied, and Cathcart's application rejected.[3]

---

**3.** Plaintiff notes that in the Court's previous opinion it observed that the *Secretary* decided that the railroad was given a conditional fee interest in Lots 3 and 4. Plaintiff correctly notes, however, that it was the *commissioner* who so held. It appears that the Secretary con-

Unbowed by his lack of success before the Secretary, Cathcart pressed his claim before Congress, and in 1908, Congress amended the 1900 grant to provide relief to Cathcart.

On May 29, 1908, as part of an omnibus act relating to various public land issues, Congress addressed the Cathcart claim as follows:

> [T]he Minnesota and Manitoba Railroad Company is hereby authorized to convey in fee simple to Thomas Cathcart, his heirs and assigns, such part as may not be needed for railway purposes of the following-described land, to wit: Lots 3 and 4 and the easterly 140 feet of the southwest quarter of section 35, in township 161 north, range 31 west, granted to it for railroad purposes by act of Congress entitled "An act granting the right of way to the Minnesota and Manitoba Railroad Company across the ceded portion of the Chippewa (Red Lake) Indian Reservation, Minnesota," approved April 17, 1900, and the restrictions upon alienation upon said grant are hereby removed, and the United States hereby relinquishes all claim or title and hereby conveys to said railroad company the fee to such part of said land as shall be conveyed to said Thomas Cathcart.

Act of May 29, 1908, Ch. 220, § 21, 35 Stat. 465, 470 (emphasis added).

The legislative history concerning this provision contains somewhat mixed messages concerning the relationship of this amendment to the 1900 grant. The Senate Committee on Indian Affairs issued a report favorably recommending passage of the Senate bill without amendment with the following observation:

> Chapter 198, page 134, Statutes at Large, Volume 31, granted a right of way to the Minnesota and Manitoba Railway Company over a portion of the ceded Red Lake Indian Reservation in Minnesota, and after making provision for a limited area for stations, provided that at the crossing of Rainy Lake River the company should take 40 acres. The act then limited the use of the land so granted to certain uses in connection with the operation of the railroad. *Obviously it was not intended to so limit the use of such 40 acres. The purpose of the present act is to authorize the sale of that portion of the 40 acres not needed for railroad purposes.*

S.Rep. No. 346, 60th Cong. 1st Sess. (1908), Defendants' Statutory Appendix at 89 (emphasis added). The House Committee on Public Lands, recommending various amendments to the Senate bill on March 26, 1908, noted that after Cathcart settled the land, the 1900 Act granted a right of way to the railroad company and the use of other lands "for railway purposes." The report notes that the land authorized by the bill to be conveyed "is not used by the railway company and it is represented to the committee that the railway company is willing to convey this land to Mr. Cathcart, reserving, however, such part as may be needed for railway purposes." H.R.Rep. No. 1324, 60th Cong. 1st Sess. (1908), Defendants' Statutory Appendix at 90.[4] The report concludes as follows:

> There does not appear to be any good reason why the authority sought in this bill should not be granted. It is believed that this will enable Mr. Cathcart to secure title to his home, and as the government has for all practical purposes parted with title to the land under the original grant, the effect of the proposed legislation only removes restriction upon the alienation of the tract, a restriction intended to secure the construction of the railway, an object which has already been accomplished.

*Id.* The report cites a statement from the Department of the Interior concerning the bill. The Department cited the proviso contained in the 1900 grant limiting the use of the lands granted for railway purposes. The Department of the Interior opined that "from this it would seem that the railroad

---

cluded that characterization of the railroad's interest was not necessary to affirmance of the commissioner's conclusions.

4. This report notes that the attempt to locate a town site upon the land had been abandoned.

company secured only an easement and that Cathcart took the fee to the east ½ southwest ¼ charged with that easement and that an abandonment by the company would relieve his land of the servitude." *Id.* The department noted that the bill was not clear on the issue of whether the bill was intended to convey to the company "a fee simple title to Cathcart to Lots 3 and 4, or to simply release any claimed easement it may have obtained under the statute" and recommended that the bill be clarified on this point. *Id.*

The bill was debated on the floor of the House on May 19, 1908. Congressman Henry of Texas expressed opposition to the bill, noting in particular that section 21 "seems to confirm a railroad grant in the State of Minnesota." The congressman requested clarification of this and other provisions. In response to Congressman Henry's concerns, Congressman Robinson stated:

> I desire to state to my friend from Texas with reference to section 21 of the bill, that *it does not approve a land grant to a railroad,* but as I understand that bill there had been in process of litigation for a great many years a small tract of land up there in the State of Minnesota, and Cathcart had exhausted his resources in litigating with the railroad. A compromise was effected, and this bill authorizes the railroad to convey to Cathcart, and so far as this tract is concerned it will give Cathcart a good title and end the litigation.

42 Cong.Rec. 6553–58 (May 19, 1908) (House) Defendants' Statutory Appendix at 102; Plaintiff's Opposition to Motion for Summary Judgment Exh. 5. Henry then asked Minnesota Representative Stenerson whether this explanation was correct. To this question, the following statements were made:

> Mr. Stenerson. Yes; it will authorize the railroad company to convey to him land upon which he has lived for nineteen years and upon which his home is located.
>
> Mr. Robinson. And upon which he has made important improvements.
>
> Mr. Gaines of Tennessee. And has been fighting the railroad all of this time.
>
> Mr. Robinson. So that instead of being a vicious measure, it is a most meritorious one.

To these statements Congressman Henry responds:

> After the lucid explanation of this section by the gentleman from Arkansas [Congressman Robinson], believing in his intelligence and ability, of course I am in favor of section 21, now understanding it.

Mr. Mondell, chairman of the House Committee on Public Lands who authored the House report discussed above then stated:

> There are no grants to railways in this bill or anything that flavors of that sort of legislation. We do authorize a certain railroad company *that has now only an easement* on a certain 80 acres of land to grant title in fee to the farmer living upon the land, and for that purpose we grant a title in fee to the railroad company.

*Id.* (emphasis added).[5]

### D. *Flowage Easements*

In 1925, the United States entered into a treaty with Great Britain for the purpose of regulating the level of the Lake of the Woods. To effectuate the treaty, the United States closed settlement of the lands affected by the treaty and filed condemnation actions against Government Lots 3 and 4, as well as other properties. The government's easement over Lots 3 and 4 was finalized by decree dated December 15, 1936 which awarded compensation in the amount of $156.25 to the Minnesota and Manitoba Railroad Company, the Canadian Northern Railroad Company, and other parties. Ifft Aff. Exh. 32. On April 13, 1938, Congress reopened the lands to settlement, imposed a flowage easement upon

---

**5.** The parties agree that there is no evidence that Cathcart ever obtained title to the disputed land. It does appear, however, that Cathcart mortgaged his interest in Lots 3 and 4 and that the mortgage was assigned in 1912 to Baxter, president of the railroad. Ifft Aff.Exh. 30, 31. According to defendants, the mortgage was never foreclosed or satisfied of record.

Chippewa lands ceded under the Nelson Act which were still owned by the United States and provided for compensation to the Indians. Act of April 13, 1938, Ch. 144, 52 Stat. 215, Defendants' Statutory Appendix at 183. That act provided that "all rights and equities of the Indians in and to the lands affected by said easement are hereby extinguished." *Id.*

### E. *The Present Lawsuit*

On August 23, 1989, plaintiff brought the present action to quiet title to the lands comprising the city of Baudette, Minnesota. Plaintiff subsequently amended its complaint to name a number of other defendants in addition to the city of Baudette claiming right, title or interest to "59.25 acres of land all in Lake of the Woods County, Minnesota." First Amended Complaint ¶ 1. Specifically, Government Lots 3 and 4. *Id.* ¶ 5.

Plaintiff's complaint alleges that the Band retained beneficial title in all lands ceded to the United States under the Nelson Act until the land was disposed of. The complaint claims that in 1945 Lots 3 and 4 were returned by the Secretary to the Band pursuant to the Indian Reorganization Act (IRA). Plaintiff seeks judgment declaring title to the land to be in the United States in trust for the Band subject to the rights of the railroad under the 1900 Act, and further declaring that none of the defendants has "any right, title, interest or claim whatsoever in the subject land." First Amended Complaint at 6. The complaint seeks judgment against each defendant for the fair market rental value of the portion claimed or used by such defendant for the period of unlawful use and an accounting from each defendant of all rents and other proceeds derived from the subject land.

On February 5, 1990, the Court denied defendants' motion to dismiss the complaint for failure to join the United States as an indispensable party as well as the motion of the State of Minnesota to dismiss the claims against it as barred by the eleventh amendment. 730 F.Supp. 972. The case is now before the Court on defendants' motions for summary judgment.

DISCUSSION

I. Whether Defendants' Motions for Summary Judgment Should be Granted

A movant is not entitled to summary judgment unless the movant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a summary judgment motion, a court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The role of a court is not to weigh the evidence but instead to determine whether, as a matter of law, a genuine factual conflict exists. *AgriStor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987). "In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences to be drawn from the facts." *AgriStor Leasing,* 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.,* 824 F.2d 582, 585 (8th Cir. 1987), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

As the Court noted in its previous order, the "crux" of this action is the Band's claim that the railroad received an easement interest rather than a fee interest

from the United States by the 1900 Act. This is not the only issue, however. Defendants argue that even if the 1900 Act granted less than a fee simple interest in the subject lands, Congress, in the 1908 Cathcart Amendment, removed any restrictions in the 1900 grant and converted the railroad's interest to fee simple with no restrictions on alienation. Defendants then argue that even if the 1908 Amendment is construed as limiting the grant of fee simple to the lands settled by Cathcart, any remaining Indian interests were extinguished by the 1938 flowage easements legislation. Finally, defendants argue that whatever reversionary interests remain in the subject lands at present, such reversion lies in the United States, not the Band, by virtue of the Band's receipt of Nelson Act compensation. In addition, the United States has filed an amicus brief arguing that even if the railroad's grant was that of an easement, the Band has no present title to the subject property because the Secretary of the Interior has not exercised his discretion to restore the property to the Band pursuant to the IRA. Each of these arguments will be discussed below.

### A. Whether the 1900 Act Granted the Railroad an Easement or Fee Simple

It is undisputed that the Nelson Act provided for a "cession in trust" to the United States, and that at least until 1900 the Band retained an equitable interest in Lots 3 and 4 while legal title was in the United States. *See Minnesota v. Hitchcock*, 185 U.S. 373, 394–95, 22 S.Ct. 650, 658–59, 46 L.Ed. 954 (1902) ("The cession was not to the United States absolutely, but in trust. It was a cession of all of the unallotted lands. The trust was to be executed by the sale of the ceded lands and a deposit of the proceeds in the Treasury of the United States to the credit of the Indians ..."). As the court held in *United States v. Brindle*, 110 U.S. 688, 693, 4 S.Ct. 180, 182, 28 L.Ed. 286 (1884):

> The cessions to the United States were in trust, to survey, manage and sell the lands and pay the net proceeds to or invest them for the Indians ... under the operation of the treaties, the Indians con-

tinued, until sales were made, the beneficial owners of all their country ceded in trust.

*See also, Ash Sheep Co. v. United States*, 252 U.S. 159, 166, 40 S.Ct. 241, 242, 64 L.Ed. 507 (1920) ("[w]hile the Indians by the agreement release their possessory right to the government, the owner of the fee, so that, as their trustee, it could make perfect title to purchasers, nevertheless, until sales should be made, any benefits which might be derived from the use of the lands will belong to the beneficiaries, and not to the trustee").

Defendants argue, however, that in 1900, Congress granted to the railroad fee simple absolute title to all lands encompassed by the map filed with the Secretary of the Interior. Defendants argue that the railroad's payment of compensation to the United States for the credit of the Band fully extinguished all rights the Band possessed, and fully executed the "cession in trust." Defendants argue that the limited use "proviso" contained in the 1900 Act was merely a non-binding statement of purpose, and did not deprive the railroad of a fee interest title to the lands such that violation of the proviso would work a "forfeiture." Defendants note that the only express "forfeiture" provision contained in the Act required construction of the railroad within two years, which condition was satisfied. Defendants draw support from the legislative history to the 1908 Amendment. Defendants note that Senate Report No. 346 opined that the proviso was "not intended to ... limit the use of [the] 40 acres." S.Rep. No. 346, 60th Cong. 1st Sess. (1908), Defendants' Statutory Appendix at 89. Defendants further note that House Report No. 1324 expresses the view that once the line was constructed, the railroad's interest in the forty-acre tract matured into a fee simple interest.

In a separate memorandum, defendants State of Minnesota, City of Baudette, Independent School District No. 386, and Minnkota Power Cooperative argue that the 1900 grant by its terms must be construed as granting fee simple, at least as to the forty acres. These defendants contend

that a party which has received consideration for the disposition of property but which seeks reversion of the parcel has the burden of proving that the consideration paid was for less than fee simple title, citing *United States Trust Co. of New York v. State of New Jersey*, 226 N.J.Super. 8, 543 A.2d 457 (1988). Since it is undisputed that the Band was compensated for the subject lands, these defendants argue that the Band bears the burden of proving that the consideration they received was for less than fee simple. These defendants contend that the proviso at section 1 was simply a "statement of purpose" and was not, like section 5 of the 1900 Act, a forfeiture provision. Defendants argue that statements of purpose are not generally interpreted as providing for expiration of fee simple upon cessation of use for the purpose named, citing Restatement of Property § 44(m) (1936). Defendants also argue that "conditions subsequent are not favored in law," quoting *United States v. Chartier Real Estate Co.*, 226 F.Supp. 285, 288 (D.R.I.1964); *Beard's Erie Basin v. People of New York*, 142 F.2d 487 (2d Cir.1944). *See also Farnham v. Thompson*, 34 Minn. 330, 26 N.W. 9 (1885) ("an estate on condition cannot be created by deed, except when the terms of the grant will admit of no other reasonable interpretation").

Plaintiff argues that the 1900 Act can only be interpreted as providing the railroad with an easement. Plaintiff places heavy reliance on the Supreme Court's decision in *Great Northern Railway Co. v. United States*, 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836 (1942). In *Great Northern*, the United States had granted to the railroad a right of way across public land pursuant to the Act of March 3, 1875, Ch. 152, 18 Stat. 482, 43 U.S.C. § 934, *et seq.* The grant included ground adjacent to the right of way to be used for station purposes. The United States did not expressly reserve mineral rights and Great Northern claimed fee title to minerals underlying its right of way. The Court reasoned that the grant was one of passage only since it granted not "a" right of way, but "the" right of way through the public lands of the United States. The Court further supported its conclusion by noting that section 2 of the Act provided that any railroad whose right of way passed through a canyon, pass or a defile "shall not prevent any other railroad company from the use and occupancy of the said canyon, pass or defile, for purposes of its road, in common with the road first located." *Great Northern*, 315 U.S. at 271, 62 S.Ct. at 532. Section 4 of the Act required the location of the right of way to be noted on the plats in the local land office and further provided that thereafter "all such lands *over* which such right of way shall pass shall be disposed of subject to such right of way." *Id.* The Court found that this reserved right to dispose of the land subject to the right of way was "wholly inconsistent with the grant of a fee." *Id.* The Court applied the rule that "nothing passes but what is conveyed in clear and explicit language," *id.* at 272, 62 S.Ct. at 533, and concluded that there was nothing in the Act which could be characterized as "clear and explicit" conveyance of the underlying oil and minerals. *Id.* The Court found that the fact that the Act was designed to permit the construction of railroads did not compel the conclusion that the railroad was granted fee title:

> The Act was designed to permit the construction of railroads through the public lands and thus enhance their value and hasten their settlement. The achievement of that purpose does not compel a construction of the right of way grant as conveying a fee title to the land and the underlying minerals; a railroad may be operated though its right of way be but an easement.

*Id.*

The Court also engaged in an extensive discussion of the history of railroad grants. The Court noted that in 1850 Congress began a policy of subsidizing railroad construction by "lavish grants from the public domain." *Id.* at 273, 62 S.Ct. at 533. The Court noted that this policy incurred public disfavor which the Court found was "crystallized" in a resolution adopted by the House of Representatives on March 11,

1872. This resolution, as quoted by the Court, provided as follows:

> Resolved, that in the judgment of this House the policy of granting subsidies in public lands to railroads and other corporations ought to be discontinued, and that every consideration of public policy and equal justice to the whole people requires that the public lands should be held for the purpose of securing homesteads to actual settlers, and for educational purposes, as may be provided by law.

*Id.* at 273–74, 62 S.Ct. at 533–34. The Court found that *"after 1871 outright grants of public lands to private railroad companies seemed to have been discontinued."* *Id.* at 274, 62 S.Ct. at 534 (emphasis added). The Court distinguished a number of cases which had recognized that railroads had received a "limited," "base" or "qualified" fee in their right of way as having been decided prior to 1872. *See, e.g., New Mexico v. United States Trust Co.,* 172 U.S. 171, 19 S.Ct. 128, 43 L.Ed. 407 (1898); *Missouri, Kansas & Texas Railway v. Roberts,* 152 U.S. 114, 116–18, 14 S.Ct. 496, 497–98, 38 L.Ed. 377 (1894).

Plaintiff also relies upon a recent decision of the United States Court of Appeals for the Ninth Circuit in *Burlington Northern Railroad v. Blackfeet Tribe,* 924 F.2d 899 (9th Cir.1991) in which Burlington Northern brought suit against various Indian tribes challenging the tribes' power to tax the railroad's right of way through reservation lands. Congress had granted the railroad's predecessor in interest a right of way through the reservation lands in 1887. The Act fixed the terms and conditions of the right of way and the railroad paid the required compensation for the right of way. The railroad argued that the tribe lacked the power of taxation because the railroad lines were not on "trust" lands. The court noted that the reservation lands occupied by the tribes, while technically "owned" by the United States, were held in trust for the tribes, and the tribes retained "beneficial ownership." Such ownership, according to the court, includes all rights normally associated with "fee simple absolute title" which may be

"diminished only by clear expression of congressional intent." *Id.* at 902. The court found that no intent to transfer the tribe's interest in the land except as necessary for use as a right of way was reflected in the grants to Burlington Northern. The court found that the grant of an exclusive easement to the railroad did not extinguish the tribes' title. *Id.* at n. 5. Citing *Great Northern,* the court noted that the grant in question was similar to that construed in *Great Northern,* in that it granted "the" right of way and not "a" right of way. According to the court, "acts of Congress will not be construed to extinguish Indian property or treaty rights unless that intent is clearly and plainly expressed." *Id., quoting County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 247–48, 105 S.Ct. 1245, 1258–59, 84 L.Ed.2d 169 (1985).

Defendants' only effort to address the impact of *Great Northern* is to argue that the language of the 1900 and 1908 Acts, and their legislative histories, are at odds with the court's finding of a congressional shift away from railroad land grants. Rather, defendants cite *New Mexico v. United States Trust Co.* and *Missouri, Kansas & Texas Railway v. Roberts* for the proposition that the 1900 Act granted them a "conditional fee." As noted above, however, these cases were distinguished by the Court in *Great Northern* as limited to land grants occurring prior to 1872.

■ The Court finds that the 1900 Act does not grant to the railroad a fee simple in the lands indicated in the Act, including the forty acres at Rainy Lake. This is the only interpretation which is consistent with the plain language of the grant and the congressional policy concerning land grants to railroads prevailing at the time of the grant, as discussed in *Great Northern.* Further, the 1908 legislative activity relating to these lands makes no sense unless the 1900 Act granted the railroad less than fee simple. Otherwise, no additional legislation would have been necessary in order to invest the railroad with adequate title to convey to Cathcart. The "proviso" limiting the use of "such lands herein granted" to

use "as and for railway purposes," cannot reasonably be construed as excluding the forty acres. The Act specifically provided that "no right of any kind would vest" in the railroad company until plats specifying the location of the railroad and station buildings were approved by the Secretary of the Interior. The map filed with the Secretary then represented that all of the grounds claimed were "actually and to their *entire extent* required by the company for the necessary uses contemplated by the [Act]." Ifft Aff. Exh. 8. Further, the conclusion of the local land office that Lots 3 and 4 were "simply granted to the company for railroad purposes, and that a subsequent entryman or claimant could take the lands only subject to the right of the railroad company to use those lands for railroad purposes" accurately characterized the nature of the grant. *Cathcart*, 34 L.D. at 622. The subsequent determination of the Commissioner of the General Land Office that the railroad held a "conditional fee in the lands" was not subsequently adopted by the Secretary who concluded that resolution of the issue of whether the railroad received a "base fee or merely an easement" was not necessary to resolution of Cathcart's case. Whether this grant was subsequently modified, and whether any remainder to the grant remains vested in the Band will be discussed below. However, the Court concludes that at least as of 1900, the railroad had not received fee simple absolute title in the lands comprising Lots 3 and 4.

B. Whether the 1908 Amendment Converted the Railroad's Interest to Fee Simple

Defendants argue that even if the railroad received less than fee simple in the 1900 grant, Congress, in its 1908 Amendment to the grant, converted its interest to fee simple in the entirety of the grant. Defendants argue that under the plain language of the amendment the railroad was authorized to transfer to Cathcart in fee simple any part of Government Lots 3 and 4 not needed by the railroad. Defendants reason that even if the transfer to Cathcart never took place, such a transfer could not have occurred unless the rights of the Indians in the lands had been extinguished. In its memorandum, the State acknowledges that the 1908 Act employed "convoluted language" but nevertheless contends that the language should be interpreted as removing all restrictions from the use and conveyance of Lots 3 and 4. The State's memorandum extensively cites the language of the House and Senate Committee Reports and argues that even if these reports do not establish Congress' intent in 1900, they do so unmistakably for 1908, and reflect Congress' intention at that time to convey fee simple to the railroad for all of Lots 3 and 4.

Plaintiff argues that the 1908 Act was intended to do, and in fact did, nothing more than seek to address the hardship case presented by Cathcart. Plaintiff cites the railroad's representations to Congress that it was "willing to convey this land to Mr. Cathcart, reserving, however, such part as may be needed for railway purposes." H.R.Rep. 1324, 60th Cong. 1st Sess. at 2 (1908). Plaintiff relies upon the Secretary's report on the 1908 Act, indicating the view that the railroad possessed only "an easement." Plaintiff also stresses that the debate on the House floor reflects Congress' concern about grants to railroads, as discussed by the Supreme Court in *Great Northern*. In particular, plaintiff notes that various congressmen assured the House members that the 1908 Amendment did not constitute a land grant but was rather limited to addressing Cathcart's concerns.

█ The Court finds that the 1908 Amendment did not alter the nature of the 1900 land grant to the railroad except as that grant related to lands to be conveyed to Cathcart. The Act provided that the railroad was "hereby authorized to convey in fee simple to Thomas Cathcart, his heirs and assigns, such part as may not be needed for railway purposes," and then provided that the United States "hereby relinquishes all claim or title and hereby conveys to said railroad company the fee *to such part of said land as shall be conveyed to said Thomas Cathcart*." Act of

May 29, 1908, Ch. 220, § 21, 35 Stat. 465, 470 (emphasis added). Defendants' interpretations ignore the underlined portion of the 1908 Amendment. A grant of fee simple in the entirety of the 1900 grant would render this language meaningless. The literal terms of the 1908 grant admit to no interpretation other than one limited to the Cathcart issue.

The Court recognizes that the Senate and House Committee reports are contradictory and ambiguous on this point. The Senate Committee report, for example, opines that the 1900 grant was not intended to limit the forty-acre parcel comprising Lots 3 and 4 to railroad use. The House Committee, however, acknowledged the need to remove a "restriction upon alienation" so that the land could be conveyed to Cathcart. *See* discussion, *supra* at 738. In addition, the House report cited a statement by the Interior Department which opined that the railroad had "secured only an easement." *Id.*

However, while the House and Senate reports may be ambiguous, the debate on the House floor unmistakably establishes that the 1908 Amendment was not perceived by those voting for it as a "land grant" to the railroad. Rep. Mondell, the chairman of the House Committee that reported favorably on the bill, and who authored the House report, explicitly assured legislators that the railroad had only an easement, and that the 1908 Act did not "grant" any additional rights to the railroad. It is an established principle of statutory interpretation that in determining congressional intent, legislative history should be viewed "as a whole." *F.E.A. v. Algonquin*, 426 U.S. 548, 570, 96 S.Ct. 2295, 2307, 49 L.Ed.2d 49 (1976) (interpreting Trade Act of 1974 to authorize President to impose license fee scheme based on statutory language and expressions from members of Congress and Executive Branch, notwithstanding rejection by conference committee of amendment expressly authorizing such power). The legislative history of the 1908 Amendment, taken as a whole, clearly establishes that the amendment was intended only to address the Cathcart situation and not to provide an additional land grant to the railroad. The

Court finds that the 1908 Amendment granted the railroad fee simple to no more than the lands claimed by Cathcart, and, then, conditional upon subsequent transfer to Cathcart. Because the lands were never transferred to Cathcart, the railroad's interest never ripened to that of fee simple and the reversion was not extinguished by the 1908 legislation.

### C. Whether the 1938 Flowage Easements Extinguished Any Remaining Indian Claim

■ Defendants argue that whatever interest may have been retained by the Band in the subject lands after the 1908 legislation, such interest was extinguished by the Act of April 13, 1938, imposing a flowage easement upon "all lands bordering on Lake of the Woods, Warroad River, and Rainy River, ceded and relinquished to the United States by the Chippewa Indians pursuant to the [Nelson] Act ... and still owned by the United States." The Act provided that "all rights and equities of the Indians in and to the lands affected by said easement are hereby extinguished." The Act provided for compensation to the Indians of $11,740.75 to be credited to the Nelson Act fund. Defendants argue that Government Lots 3 and 4 are within the geographic scope of the above description.

Plaintiff argues that this Act did not include Lots 3 and 4. Plaintiff relies on a 1936 letter from the Army Corps of Engineers submitted to Congress in connection with the 1938 legislation entitled "Lands Owned by the United States on Which a Flowage Easement was Permitted by Treaty Between the United States and Great Britain, Ratified July 17, 1925. These lands are also subject to the provisions of the Chippewa Indian Act of January 14, 1889." The list does not include Lots 3 and 4 by legal description.

It is true that the letter submitted to Congress in connection with the 1938 Act does not list Lots 3 and 4. The Court, however, does not find this fact dispositive. The issue before the Court is whether the 1938 Act, by its terms, encompasses Lots 3 and 4. The Act, by its terms, imposes a

flowage easement upon certain lands and extinguishes all rights and equities of the Indians in and to the lands affected by the easement. The lands specifically cited in the statute are "all lands bordering on Lake of the Woods, Warroad River, and Rainy River, ceded and relinquished to the United States by the Chippewa Indians pursuant to the [Nelson] Act ... and still owned by the United States." Act of April 13, 1938, Chapter 144, 52 Stat. 215; Statutory Appendix at 183. The Act provided for compensation in the amount designated in the Nelson Act to be paid by the United States into the Nelson Act fund, less amounts previously paid. The Act concludes with the direction that "no moneys received from the sale or other disposition of any lands for which the Indians receive payment under section 1 hereof shall be placed to the credit of the Indians." *Id.*

It is undisputed that Lots 3 and 4 come within the literal description set forth in the Act. At oral argument, the Court questioned plaintiff's counsel as follows:

> THE COURT: Well, when you take the language, "all lands bordering on Lake of the Woods, Warroad River and Rainy River, ceded and relinquished to the United States by the Chippewa Indians pursuant to the Act entitled, 'An Act for the Relief and Civilization of the Chippewa Indians in the State of Minnesota,' approved January 14, 1889," doesn't that language include this land?

Tr. at 40. To this question, plaintiff's counsel responded:

> MR. SONOSKY: I would say that it would have to include all land. This land—this land falls within the ambit of that language. It's included.

*Id.*

It is not entirely clear why the list submitted to Congress in connection with the 1938 legislation failed to include Lots 3 and 4. It may be that the government agencies charged with preparing the list erroneously assumed that the 1900 railroad grant, which encompassed Lots 3 and 4, fully conveyed all right, title and interest in that land to the railroad. As discussed above in connection with the Cathcart issue, it appears that the Department of the Interior was itself uncertain as to the nature of the railroad's title to the land. *See, generally, Cathcart v. Minnesota Manitoba Railroad Co.,* 34 L.D. 619 (1906) (Defendants' Statutory Appendix at 193). *See* discussion, *supra* at 733–734. This may also explain why the United States felt it was necessary to bring a condemnation action against the railroad to impose a flowage easement in June of 1930 against Lots 3 and 4 in connection with the treaty with Great Britain which resulted in an award of compensation of $156.25 to the railroad by decree dated December 15, 1936.

■ As indicated above, resolution of this historical conundrum is unnecessary. Where a portion of an act's legislative history conflicts with the plain meaning of a statute, the statutory language must control. *In re Erickson Partnership,* 856 F.2d 1068, 1070 (8th Cir.1988). The clear language of the statute encompasses Lots 3 and 4. Whatever equitable interest plaintiff retained in Lots 3 and 4 prior to 1938 were clearly extinguished by the Flowage Easement Act.[6]

## CONCLUSION

Based upon the foregoing, the Court finds that there are no genuine issues of material fact precluding a grant of summary judgment. Whatever rights the plaintiff retained in the lands at issue in this lawsuit were entirely extinguished by Congress by the Act of April 13, 1938.

---

6. Because the Court concludes that any rights or equities retained by the plaintiff in Lots 3 and 4 were extinguished by the Flowage Easement Act, it necessarily follows that Lots 3 and 4 could not have been restored to the plaintiff by the Secretary of the Interior in his 1945 order pursuant to the Indian Reorganization Act. In addition, because whatever rights plaintiffs had in Lots 3 and 4 have been extinguished, it is unnecessary to address defendants' argument that whatever reversionary interest remained in the lands following the 1900 grant of an easement to the railroad reposed in the United States, not the Band, by virtue of the Band's receipt of Nelson Act compensation. Even if the Band retained the reversion, the reversionary interest was extinguished by the Flowage Easement Act in 1938.

Accordingly, upon all the files, records and proceedings in this case,

IT IS ORDERED that defendants' motions for summary judgment are granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.